FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COLIN RAKER DICKEY,

*Petitioner-Appellant,*

v.

RONALD DAVIS, Warden, San Quentin State Prison,

*Respondent-Appellee.*

No. 19-99009

D.C. No. 1:06-cv-00357-AWI-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, District Judge, Presiding

Argued and Submitted June 21, 2022
Pasadena, California

Filed May 31, 2023

Before: Mary H. Murguia, Chief Judge, and William A. Fletcher and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

# SUMMARY[*]

## Habeas Corpus / Death Penalty

On Colin Raker Dickey's appeal from the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging his California conviction and death sentence, the panel reversed and remanded to the district court with instructions to grant a conditional writ of habeas corpus as to the special-circumstances findings and the imposition of the death penalty, and affirmed the district court's holding as to Dickey's certified guilt-phase claims.

Dickey was sentenced to death in 1991 after a California state jury convicted him of robbery, burglary, and felony murder.

Dickey raised several certified claims, including claims that the prosecutor knowingly used false and misleading testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and failed to disclose favorable material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

The panel wrote that this is an exceptional case in which the prosecutor deliberately elicited, and then failed to correct, false and misleading testimony from the State's star witness, Gene Buchanan. The prosecutor went on to exploit Buchanan's false testimony in his closing argument. He also failed to produce evidence to the defense team that would have seriously impeached Buchanan's testimony. These

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

points were uncontested; the central issue in this appeal was the materiality of the State's *Napue* and *Brady* violations.

To obtain the death penalty, the State was required to prove special circumstances. The panel wrote that the record makes clear that the State's special-circumstances evidence depended on Buchanan's testimony. It also makes clear that the prosecutor recognized the jury would have ample reason to doubt Buchanan. To shore up Buchanan's testimony, the State asked the court to read aloud a California statute that put Buchanan on notice that he would subject himself to the death penalty if he lied under oath and Dickey was wrongfully convicted and executed. What the jury did not know—because the prosecutor did not correct the false testimony—is that Buchanan did lie to them under oath, even given the potential consequences for doing so in a capital case.

Reviewing under the deferential standard afforded to state-court decisions by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), the panel concluded it was objectively unreasonable for the state court to decide that the prosecutor's misconduct was immaterial to the jury's special-circumstances findings. The panel reached this conclusion because the State's case for the death penalty unquestionably hinged on Buchanan's testimony, and applying *Napue*'s materiality standard through the lens of AEDPA, it was objectively unreasonable to conclude that correcting Buchanan's false testimony could not have changed the jury's decision to impose the death penalty. Because the panel held that the requirement of § 2254(d) is satisfied, the panel resolved Dickey's claim without the deference AEDPA otherwise requires. On de novo review, the panel held that Dickey is entitled to relief.

The panel therefore reversed and remanded to the district court with instructions to grant a conditional writ as to the jury's special-circumstances findings and imposition of the death penalty. The panel did not reach the merits of any of Dickey's other penalty-phase claims.

The panel affirmed the denial of Dickey's certified guilt-phase claims related to his conviction for aiding and abetting the underlying robbery. First, the panel concluded the state court reasonably determined that the State's *Napue* and *Brady* violations were not material to the jury's guilt-phase verdict and that trial counsel's failure to investigate and impeach Buchanan was not prejudicial in the guilt phase. Separately, the panel separately concluded the California Supreme Court could have reasonably determined that Dickey failed to show guilt-phase prejudice stemming from counsel's strategy of seeking to select jurors who were predisposed to vote for the death penalty. Third, the panel concluded the California Supreme Court could have reasonably denied Dickey's claim that trial counsel should have withdrawn based on an irreconcilable conflict. The panel did not reach the merits of any of Dickey's uncertified guilt-phase claims.

---

**COUNSEL**

David Senior (argued), Matthew L. Weston, and Ann K. Tria, McBreen & Senior, Los Angeles, California, for Petitioner-Appellant.

Justain P. Riley (argued) and Kimberley A. Donohue, Deputy Attorneys General; Kenneth N. Sokoler, Supervising Deputy Attorney General; Michael P. Farrell and James

William Bilderback II, Senior Assistant Attorneys General; Xavier Becerra, Attorney General of California; Office of the California Attorney General; Sacramento, California; for Respondent-Appellee.

---

**OPINION**

CHRISTEN, Circuit Judge:

Colin Raker Dickey was sentenced to death in 1991 after a California state jury convicted him of robbery, burglary, and felony murder. He appeals the district court's denial of his federal habeas corpus petition filed pursuant to 28 U.S.C. § 2254. Dickey raises several certified claims, including claims that the prosecutor knowingly used false and misleading testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and failed to disclose favorable material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

This is an exceptional case in which the prosecutor deliberately elicited, and then failed to correct, false and misleading testimony from the State's star witness, Gene Buchanan. The prosecutor went on to exploit Buchanan's false testimony in his closing argument. He also failed to produce evidence to the defense team that would have seriously impeached Buchanan's testimony. These points are uncontested; the central issue in this appeal is the materiality of the State's *Napue* and *Brady* violations.

To obtain the death penalty, the State was required to prove special circumstances, and the record makes clear that the State's special-circumstances evidence depended on

Buchanan's testimony. It also makes clear that the prosecutor recognized the jury would have ample reason to doubt Buchanan. To shore up Buchanan's testimony, the State asked the court to read aloud a California statute that put Buchanan on notice that he would subject himself to the death penalty if he lied under oath and Dickey was wrongfully convicted and executed. What the jury did not know—because the prosecutor did not correct the false testimony—is that Buchanan did lie to them under oath, even given the potential consequences for doing so in a capital case.

Reviewing under the deferential standard afforded to state-court decisions by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), we conclude it was objectively unreasonable for the state court to decide that the prosecutor's misconduct was immaterial to the jury's special-circumstances findings. We reach this conclusion because the State's case for the death penalty unquestionably hinged on Buchanan's testimony, and applying *Napue*'s materiality standard through the lens of AEDPA, it was objectively unreasonable to conclude that correcting Buchanan's false testimony could not have changed the jury's decision to impose the death penalty. Because we hold that the requirement of § 2254(d) is "satisfied," we "resolve [Dickey's] claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). On de novo review, we hold that Dickey is entitled to relief.

We therefore reverse and remand to the district court with instructions to grant a conditional writ of habeas corpus as to the jury's special-circumstances findings and imposition of the death penalty. We deny relief on Dickey's

guilt-phase claims and do not reach his remaining penalty-phase claims.

# I

## A

Marie Caton and Louis Freiri were attacked at Caton's Fresno, California residence in November 1988. *People v. Dickey*, 111 P.3d 921, 928 (Cal. 2005). Caton's daughter, Lavelle Garratt, went to check on her mother on November 8 and discovered Caton unconscious in her bedroom. *Id.* Caton had been beaten and had multiple stab wounds. *Id.* She died of her injuries eleven days later. *Id.* Garratt found Freiri dead from stab wounds in the archway between the dining room and the living room. *Id.* When the police arrived, they discovered two suspicious knives in Caton's kitchen and a venetian blind cord wrapped around Freiri's neck. *Id.* The venetian blinds in Caton's house were all intact, and no usable fingerprints were found at the scene of the crime. *Id.* at 928 & n.2. Garratt told the police that she suspected her son, Richard Cullumber, had attacked Caton and Freiri. *Id.* at 928. Garratt explained that Cullumber was a drug addict who frequently asked Caton for money, and that Caton was known to hide large amounts of cash throughout her house. *Id.*

Cullumber lived in an apartment on Harvard Avenue in Fresno with Dickey and four other roommates, including Gail Goldman and Richard Buchanan. *Id.* Cullumber's roommates told the police that Cullumber had packed a bag and left the apartment on the night of the murders. *Id.* Five days later, Cullumber commandeered a car after the police tried to stop him, warning the driver: "I need the car; I've already killed a woman." *Id.* He was cornered after a high-

speed chase and killed himself with a pistol registered to
Freiri. *Id.*

Several months after the murders, Buchanan saw a flyer
at a convenience store announcing that Caton's relatives
were offering a $5,000 reward for information leading to
conviction of the perpetrator of the murders.[1]  *Id.* at 929 n.3,
930–31, 937.  Buchanan left his name with the store clerk,
and he was put in touch with Detective Doug Stokes.  *Id.* at
930–31.  Buchanan told Stokes that Dickey had been
involved in the murders, and Stokes circled back to the
Harvard Avenue apartment to continue his investigation.
Stokes spoke to Goldman, who had initially denied knowing
anything about the murders.  *Id.* at 930.  This time, she
shared more information about events that night.  *Id.* at 929–
30.

Goldman died before the trial began, but her sworn
testimony from Dickey's preliminary hearing was read into
the record at trial.[2]  *Id.* at 929 n.4.  In her preliminary hearing
testimony, Goldman said that on the night of the murders she
saw Cullumber take a venetian blind out of the hall closet in
their apartment and go into the bedroom with it.  *Id*. at 929.
Later, she noticed the blind had been returned to the closet
and a blind in the bedroom was missing a cord.  *Id*.  Goldman
said that she saw Dickey walk into the kitchen that same
night and open a drawer.  *Id.*  She initially testified that
Dickey looked in a knife-and-silverware drawer, but she

---

[1] The reward was originally $3,000 but was later raised to $5,000.

[2] The State also presented testimony from Detective Stokes, who gave
his account of what Goldman told him during the investigation.  *Id.* at
929.  Stokes's version of Goldman's account differed from Goldman's
own testimony in several respects.  *See infra* Part IV.C.

later clarified that she did not see which drawer Dickey had opened. *Id*. at 929 & n.5. According to Goldman, Dickey and Cullumber soon left the apartment. *Id*. at 929. Goldman believed the men had no money when they left because Cullumber had asked her for money to buy cigarettes. *Id*. When the two men returned to the apartment later that evening, Cullumber packed his bags, gave Goldman $40 or $50 in cash to repay a debt, and left. *Id*. Goldman testified that when Detective Stokes showed her one of the knives found at Caton's home, she told him, "I have a knife exactly like that knife, or they are twins[,] . . . . [b]ut mine is in storage with all my stuff that I have in storage." When the prosecutor followed up by asking whether she had "a knife exactly like that in the apartment on Harvard," Goldman responded, "I -- yes," without specifying when the knife was at the apartment or whether it was at the apartment but in storage on the night of the murders.

Goldman also testified that she and Dickey were watching the news together shortly after the murders and saw a story reporting that Freiri was dead and Caton was still alive but near death. *Id*. Dickey became upset and told Goldman that he wanted to talk to her in the bedroom, and Buchanan followed them. *Id*. In the bedroom, Dickey told Goldman that he had accompanied Cullumber to Caton's house to "help [him] get the money," but he had nothing to do with the two murders. *Id*. (alteration in original). Goldman recalled Dickey saying that Cullumber had assured him "nothing was going to happen," and that at Caton's house, Dickey searched for money in Caton's bedroom with Caton present. *Id*. When Dickey stepped out of Caton's bedroom, he saw Freiri slumped over in a chair in the living room and "knew something had happened." *Id*. Cullumber then "went beserk" and "came into the bedroom and started

beating up on [Caton]." *Id.* The two men found $700, which they split. *Id*.

Dickey was charged in Fresno County Superior Court with robbery, burglary, and aiding and abetting murder. *Dickey v. Davis*, 231 F. Supp. 3d 634, 653 (E.D. Cal. 2017). He pled not guilty to all the charges. *Id.* There was no physical evidence linking Dickey to the crime scene and no living witnesses to the crime. The State did not argue at trial that Dickey killed Caton or Freiri. It argued only that he was guilty under an aiding-and-abetting theory. *Id.* at 714–15. The State sought the death penalty and alleged a number of special circumstances that allowed imposition of the death penalty under California law. *See* Cal. Penal Code § 190.2(a)(3), (17)(A) & (G). The jury was instructed that in order to find any of the special circumstances true, it must find that Dickey "intended either to kill a human being or to aid another in the killing of a human being."

## B

Goldman's preliminary hearing testimony was read to the jury, but her death left Buchanan as the State's primary living witness at trial.

Buchanan's trial testimony mirrored Goldman's preliminary hearing testimony in some respects. He too testified that Dickey and Cullumber left the apartment on the night of the murders, that they had no money when they left but had money when they returned, and that Dickey saw a news story about the crime a couple days later and admitted that he had been involved in the robbery. *Dickey*, 111 P.3d at 930.

But in key respects, Buchanan's testimony was much more incriminating than Goldman's. He testified that it was

Dickey, not Cullumber, who removed a cord from a venetian blind in the apartment on the night of the murders. *Id.* He also told the jury that when he looked into the bedroom after Dickey had returned a blind to the closet that night, he saw a knife identical to Goldman's on the bed. *Id.* Buchanan added that when Dickey and Cullumber had returned to the apartment, Dickey asked Buchanan to take him and Cullumber for a drive. *Id.* According to Buchanan, Dickey threw a pair of shoes and his jacket out the car window during the drive. *Id.*

Buchanan described following Goldman and Dickey into a bedroom at the Harvard Avenue apartment a couple days after the murders and hearing Dickey tell Goldman that:

> him and [Cullumber] had been over to [Cullumber]'s grandmother's house, and that they had entered the house -- how he had done it, how he had walked up to the door, knocked, faked like [Cullumber] was going to be in jail, needed to use the phone, and then [Cullumber] sneaked in, they were supposed to tie him them [sic] up, get this money and everything. And while [Dickey] is supposedly in the bedroom looking for the money he hears a commotion, looked out the bedroom door, sees an elderly man with his head slumped down, considers him dead, and that if you kill one you might as well kill them both.

When asked to clarify what he meant by the last statement, Buchanan said, "[Dickey] said that he—only what he thought, he didn't say what he did. He said that, 'If you kill

one you might as well kill them both.'" *Id.* According to Buchanan, Dickey "didn't say he said it to [Cullumber], he just said it as that was his opinion." *Id.* Notably, in Goldman's preliminary hearing testimony recounting the conversation she had with Dickey in the bedroom of the Harvard Avenue apartment, she said nothing at all about Dickey making this statement.

The jury heard testimony explaining that Buchanan did not come forward until he saw a flyer announcing the reward, several months after he heard Dickey's conversation with Goldman. *Id.* Buchanan testified that he came forward because of his Christian upbringing, not because of the reward money. *Id.* at 931. However, in her preliminary hearing testimony, Goldman said that Buchanan told her he intended to turn in Dickey so that he could collect the reward. *Id.* at 930. The jury also heard testimony from Dickey, Goldman, and the defense investigator that Dickey and Buchanan strongly disliked each other. *Id.* at 931. The defense investigator testified that Buchanan mentioned his dislike for Dickey every time they met, and Dickey and Buchanan both testified that Buchanan was particularly angry with Dickey because Dickey had torn up the only photo Buchanan had of his youngest daughter. *Id.* Adding to his credibility problems, Buchanan admitted at trial that he frequently used heroin and cocaine, that he had used drugs an hour or two before he heard Dickey admit his involvement in the robbery, and that he had continued using drugs as recently as the day before his trial testimony.

## C

The prosecutor, Ken Hahus, labored throughout the trial to mitigate Buchanan's credibility issues. To buttress Buchanan's credibility, Hahus asked Buchanan to confirm

on re-direct examination that he was aware of California Penal Code § 128, which provides that "[e]very person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole." At Hahus's request, the trial court took judicial notice of that statute and read it aloud to the jury.

Immediately after the trial court read § 128 aloud, Hahus asked Buchanan about his interactions with defense investigator Melvin King and whether King ever bought him anything. Buchanan testified that King bought him beer on about three occasions, lunch, and a pair of shoes. Hahus then asked Buchanan leading questions that compared Buchanan's interactions with King to Buchanan's interactions with the district attorney's office:

> Q. *At anytime have you spoken with anybody who's told you they were from my office, from the D.A.'s Office?*
>
> A. *No, sir, only when they've come to pick me up for court.*
>
> Q. *You've talked to me a couple of times; is that right?*
>
> A. *Yes, sir.*
>
> Q. *At anytime have the folks who've come to pick you up from my office or me, have we bought you anything?*
>
> A. *Not a single thing, sir.*

Hahus and Buchanan both knew this testimony was false, but Hahus made no move to correct it. Instead, in his

closing argument, Hahus reminded the jury of this testimony, emphasizing that King, the defense investigator, was the "only investigator who supplied Buchanan with money or alcohol." In line with Buchanan's false testimony that Buchanan and Hahus had met only "a couple of times," Hahus also argued in closing that "[i]t's pretty clear Buchanan was not prepared to testify, that he was not scripted to testify."

Hahus also acknowledged in his closing argument that there were multiple reasons to doubt Buchanan's word. But he gave the jury his own opinion of Buchanan's truthfulness: "Do you think Gene Buchanan would lie for $5,000? Maybe. Do you think Gene Buchanan would lie to send a man to prison? I don't think so." Dickey's lawyer objected, and the judge duly instructed the jury to ignore Hahus's statement.

Hahus then emphasized to the jury that Buchanan knew that under § 128 he could face life in prison or the death penalty for perjuring himself in a capital case. Hahus told the jury that Buchanan was a "street-wise," "con-wise" drug addict, and a "hype" who used hypodermic needles. But Hahus argued that Buchanan still "deserves to have you listen to what he says when he comes into this courtroom":

> *He's still a street person, he's still a con, he didn't change just because he heard a man admit to burglary, robbery and murder; he's still the same man. But that doesn't mean that the truth cannot come out of the mouth of a drug addict. It can come out of the mouth of a drug addict just as well as it can come out of the mouth of a priest.*

\* \* \*

*Do you think Gene Buchanan would lie to send a man to prison? Perhaps. Do you think Gene Buchanan would lie to send a man to prison that he doesn't like? Even more perhaps. Do you think Gene Buchanan would lie to send a man to prison behind a murder charge where Gene Buchanan himself could face a capital case for it?*

*There's honor among thieves. There's also something else; some things are more important than others, and even though he might be a sleazy hype, do you really think he made all this up for 5,000 bucks when it's this serious?*

The jury convicted Dickey of two counts of robbery, one count of burglary, and two counts of felony murder. It also found true several special circumstances: (1) felony-murder robbery; (2) felony-murder burglary; and (3) multiple murder. *Dickey*, 231 F. Supp. 3d at 653. At the penalty phase, defense counsel presented no mitigation evidence but argued that Dickey did not deserve the death penalty because the State's theory of the case was limited to Dickey acting as an aider and abettor. The jury imposed the death penalty.

## II

After Dickey was sentenced, the trial court appointed substitute counsel to represent him. *Id.* His new counsel filed motions for a new trial and to modify the verdict. *Id.* The motions argued that Buchanan's testimony concerning whether the prosecution provided him favors had been false and misleading.

At the hearing on Dickey's motion for a new trial, the defense team discovered that the prosecution had known Buchanan gave false testimony, and rather than correcting it, the prosecutor had used it in his closing argument. Dickey learned that it had been the State's investigator who arranged a deal with the proprietor of a local boarding house to provide room and board for Buchanan pending receipt of the reward for his trial testimony. The jury had heard that Buchanan was living in a boarding house on credit, but it did not know that the State had brokered the arrangement.

The defense team also learned from Hahus that he had met with Buchanan "probably a dozen times before the trial," not "a couple of times" as Hahus had posited in the leading question he had posed to Buchanan.

Hahus further disclosed at the post-trial hearing that Buchanan had lied to him about a consequential matter during their very first phone call. Hahus testified that Buchanan called him approximately a year and a half before trial and said that he had failed to appear at a hearing on felony drug charges. Buchanan wanted to know if a warrant had issued for his arrest and, if so, whether Hahus could get it withdrawn. Hahus recalled Buchanan telling him that he and his lawyer had met with Barbara Dotta, the prosecutor handling Buchanan's felony drug case, that Dotta had agreed to dismiss the charges against Buchanan because he was "a prime witness in the Dickey case," and that Dotta purposefully kept this agreement off the record so Dickey's counsel would not know about it.

Hahus testified that he "came unglued" after receiving this call from Buchanan and "began yelling at [Buchanan] that that was a load of BS," that no deal had been made, and that any deals made with witnesses in the Dickey trial would

go through Hahus. Hahus testified that he "was a little peeved, frankly, that [Buchanan] thought [he] was so big of an idiot that [he] would believe [Buchanan] telling [him] that another DA had made some type of deal and was purposefully trying to keep it from a defense attorney." Hahus took notes about this conversation with Buchanan but testified that he did not disclose them to Dickey's counsel until "shortly before the hearing on the motion for a new trial." *Dickey*, 111 P.3d at 937.

Based on this newly discovered evidence and information, Dickey argued that the prosecutor had knowingly solicited and used false testimony in violation of *Napue*, 360 U.S. 264, and also failed to disclose favorable material evidence in violation of *Brady*, 373 U.S. 83. The trial court denied the motion for a new trial without addressing whether the State's knowing use of false testimony might have affected the jury's decision. *Dickey*, 111 P.3d at 944. Instead, the court focused on whether Buchanan had created a false impression in the minds of the jury about whether the State bought him anything. The trial court reasoned that the State "only acted as a conduit" and had not been involved in providing the benefit Buchanan received from the boarding house arrangement. *Dickey*, 231 F. Supp. 3d at 750. The court did not discuss Buchanan's false testimony that he had met with Hahus only a couple of times. Dickey's post-trial motions were denied, and he was sentenced to death in 1992. *See id.* at 653–54.

In 2005, the California Supreme Court considered Dickey's direct appeal, which included his *Napue* and *Brady* claims. *Dickey*, 111 P.3d 921. It affirmed his conviction and sentence. *Id*. Dickey also raised these claims in his first state habeas petition, which the California Supreme Court denied. The court denied the claims on the merits and also stated that

they were barred because they had been raised and rejected on direct appeal.[3]

Dickey filed his federal habeas petition in 2007. The district court denied relief on his guilt-phase claims in 2017, *Dickey*, 231 F. Supp. 3d 634, and denied relief on his penalty-phase claims in 2019, *Dickey v. Davis*, No. 1:06-cv-00357-AWI-SAB, 2019 WL 4393156 (E.D. Cal. Sept. 13, 2019). The court granted a certificate of appealability (COA) as to whether the prosecution knowingly used false evidence in violation of *Napue* and failed to disclose favorable impeachment evidence in violation of *Brady* (Claim XIII).[4] *Id.* at *153. Dickey timely appealed the district court's rulings. We have jurisdiction pursuant to 28 U.S.C. § 1291 and § 2253(a).

## III

We review de novo a district court's denial of habeas relief. *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019). Because Dickey filed his federal habeas petition after

---

[3] Dickey argues that, because the California Supreme Court denied his first state habeas petition summarily, there was no adjudication on the merits, and this court should review his claim de novo. This is incorrect. The California Supreme Court expressly stated that all of Dickey's claims were denied on the merits, and the Supreme Court has held that a state court's unexplained denial is assumed to be an adjudication on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 187–88 (2011); *Harrington v. Richter*, 562 U.S. 86, 100 (2011).

[4] The district court also granted a COA on whether counsel was ineffective for intentionally seeking to empanel a pro-death jury (Claim I); whether counsel was ineffective for failing to investigate and impeach Buchanan (Claim II(E)); and whether the trial court should have held a *Marsden* hearing and whether counsel should have withdrawn from his representation of Dickey (Claims V and II(I)). *Dickey*, 2019 WL 4393156, at *153.

April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) applies. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). AEDPA prohibits a federal court from granting a petition for a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision . . . as the basis for its judgment." *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). When there is no reasoned state-court decision addressing a habeas claim, there is a rebuttable presumption that the state court adjudicated the claim on the merits. *See Harrington*, 562 U.S. at 99–100. In that circumstance, federal courts must consider what arguments could have supported the state court's decision and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with a prior Supreme Court holding. *See id.* at 102.

A state court's decision is contrary to clearly established federal law if it "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Cook v. Kernan*, 948 F.3d 952, 965 (9th Cir. 2020) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). "Clearly established federal law" refers to the Supreme Court's holdings "as of the time of the relevant state-court decision." *Avena*, 932 F.3d at 1247 (alterations

omitted) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)). Circuit precedent does not clearly establish federal law for purposes of § 2254(d)(1). *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013). If a petitioner overcomes the § 2254(d)(1) bar by showing the state court's decision was contrary to clearly established federal law, "he must also demonstrate that he is entitled to relief without the deference required by AEDPA." *Jones v. Ryan*, 52 F.4th 1104, 1115 (9th Cir. 2022); *see also Johnson v. Williams*, 568 U.S. 289, 303 (2013).

## IV

Before the California Supreme Court, Dickey argued that the State violated *Napue* by presenting and failing to correct false or misleading testimony. Specifically, Dickey argued that the prosecutor elicited false testimony from Buchanan that: (1) the State had not provided any favors to Buchanan; and (2) Buchanan met with Hahus only "a couple of times" prior to trial. The California Supreme Court agreed that Buchanan's testimony created the false impression that the prosecution had not provided him any favors, but it did not address Buchanan's testimony concerning the number of pretrial meetings he had with Hahus. *Dickey*, 111 P.3d at 937–38. The court decided the State's *Napue* violation regarding favors was not material, reasoning that the prosecutor's failure to correct Buchanan's testimony could not have made a difference at trial. *Id.* at 938.

For nearly ninety years, it has been established Supreme Court precedent that a conviction violates due process if it is obtained through knowing presentation of perjured testimony. *See Mooney v. Holohan*, 294 U.S. 103, 112–13 (1935) (per curiam). In 1957, the Supreme Court held that a prosecutor's failure to correct a material false impression

also violates due process. *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (per curiam). Dickey's habeas petition specifically invokes *Napue*, in which the Supreme Court established that a conviction is invalid if the State is aware of a material falsity and fails to correct it, regardless of whether the State intentionally solicited the false evidence or testimony. *See Napue*, 360 U.S. at 269–70. This is so because the State's knowing use of false testimony prevents "a trial that could in any real sense be termed fair." *Id.* at 270 (quoting *People v. Savvides*, 136 N.E.2d 853, 855 (N.Y. 1956)). "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id.* at 269.

To prevail on his *Napue* claim, Dickey bore the burden of showing that: "(1) testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (alteration in original) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)); *see Napue*, 360 US. at 269–71. The Supreme Court has repeatedly acknowledged that the introduction of false testimony is corrosive to the "truth-seeking function" of our adversarial system. *United States v. Agurs*, 427 U.S. 97, 103–04, 103 n.8 (1976) (collecting cases). The Court has thus explained that the materiality analysis for a *Napue* violation requires that a conviction "must be set aside if there is *any reasonable likelihood* that the false testimony *could have* affected the judgment of the jury." *Id.* at 103–04 (emphasis added); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972).

*Napue*'s materiality standard is considerably less demanding than the standard for *Brady* claims, which requires that a petitioner show "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would have* been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (emphasis added) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). The Supreme Court has explained that *Napue*'s materiality threshold is lower "not just because [*Napue* cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104; *see also Mooney*, 294 U.S. at 113 ("[A] deliberate deception of court and jury by the presentation of testimony known to be perjured . . . is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation."). *Napue*'s more lenient materiality standard, and the Supreme Court's explanation of the rationale for this standard, are pivotal to the decision we reach in Dickey's appeal.

## A

Dickey argues that the California Supreme Court recited the correct legal standard for his *Napue* claim, but based its decision on an incomplete assessment of Buchanan's false testimony, a misapplication of the *Napue* materiality standard, and an unreasonable determination of the facts.[5]

---

[5] Dickey argues that the California Supreme Court's decision was premised on an unreasonable determination of the facts because the court "substantially and unreasonably misstated its factual record regarding the extent of Buchanan's indebtedness [to Margie Strickland, who operated the boarding house at which he was staying]." Because we

As recounted above, to buttress Buchanan's credibility before the jury, Hahus asked Buchanan to confirm on re-direct examination that he was aware of California Penal Code § 128.  Hahus then requested that the trial court read that statute aloud to the jury[6] and immediately followed the court's reading with a series of leading questions designed to contrast Buchanan's interactions with defense investigator King against his contacts with the district attorney's office:

> Q. *At anytime have you spoken with anybody who's told you they were from my office, from the D.A.'s Office?*
>
> A. *No, sir, only when they've come to pick me up for court.*
>
> Q. *You've talked to me a couple of times; is that right?*
>
> A. *Yes, sir.*
>
> Q. *At anytime have the folks who've come to pick you up from my office or me, have we bought you anything?*
>
> A. *Not a single thing, sir.*

---

grant relief on Dickey's penalty-phase *Napue* claim on other bases, we do not reach this argument.

[6] The trial court stated: "The court will take judicial notice of Penal Code Section 128.  Ladies and -- members of the jury: Penal Code Section 128 provides as follows, and I quote: 'Every person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole.  The penalty shall be determined pursuant to Sections 190.3 and 190.4.'"

Unbeknownst to the jury, this testimony was false—and the State knew it.  It was not until the post-trial hearing on Dickey's motion for a new trial that the State's investigator, Willie Martin, revealed that Buchanan contacted Martin because he "needed food and a place to stay" after he had been released from jail for an unrelated drug charge in March 1989 and wanted to know what the district attorney's office could do to help him.  The district attorney's office had no funds available to assist Buchanan with housing, but Martin was aware of the $5,000 reward.  Martin contacted Margie Strickland, a boarding house operator, and asked whether she would consider allowing Buchanan to stay at her boarding house and forego paying rent until he received the anticipated reward.  Strickland agreed, and Martin memorialized the agreement on the Fresno District Attorney's Office letterhead.  Buchanan signed the agreement, and Martin and another district attorney's office employee witnessed it.  Strickland periodically sent running tallies to Martin at the district attorney's office indicating how much money Buchanan owed her.  These tallies included sums for separate loans totaling several hundred dollars that Strickland made to Buchanan for incidentals like cigarettes and "personal needs."[7]  At the post-trial hearing on Dickey's motion for a new trial, Hahus conceded that when he questioned Buchanan at trial, he was aware of Buchanan's housing arrangement and Martin's role in brokering the agreement.  *Dickey*, 111 P.3d at 938.  Hahus also revealed that he had "probably a dozen" pretrial

---

[7] After the trial court heard at the post-trial hearing that the district attorney's office had arranged housing for Buchanan, the court stated, "That's a favor."  The prosecutor conceded, "Well, sure it's something, yeah, absolutely, absolutely."

meetings with Buchanan, not the "couple of" meetings he posited in the questions he had posed to Buchanan at trial.

## B

The last reasoned state-court decision addressing Dickey's *Napue* claim is the California Supreme Court's decision denying his direct appeal. *Dickey*, 111 P.3d at 936–38. The court rejected Dickey's *Napue* claim based on Buchanan's false and misleading testimony that personnel from the prosecutor's office had not bought him "a single thing." *Id.* at 937–38. Focusing on the trial colloquy in which Hahus elicited responses to contrast the favors Buchanan received from the defense (beer on three occasions, lunch, and a pair of shoes) with the benefits provided to Buchanan by the prosecution, the court agreed that the prosecutor had knowingly created the false impression "that unlike the defense, the prosecution had done nothing for Buchanan that might reflect on his credibility." *Id.* The California Supreme Court observed that the prosecutor "sought to exploit the false impression he had created" in his closing argument, but concluded that Dickey had not met his burden of showing the false testimony was material. *Id.* at 937–38. The court reasoned, "in light of other information the jury had about Buchanan's arrangement with the proprietor of the boarding house, as well as other indications of his interest in obtaining the reward, the prosecutor's action was harmless beyond a reasonable doubt." *Id.* at 937; *see also Bagley*, 473 U.S. at 679–80, 679 n.9 (opinion of Blackmun, J.). The court did not mention Buchanan's false testimony that he had met with Hahus only "a couple of times."

In a separate section of its decision discussing Dickey's challenge to the sufficiency of the evidence supporting the

special circumstances, the California Supreme Court also observed that "Buchanan's testimony as to [Dickey's] statement did not occur in a vacuum." *Dickey*, 111 P.3d at 934. The court concluded there was other evidence sufficient to support an intent-to-kill finding, although the prosecution did not rely on it. *Id.* The court explained:

> Under the evidence, the jury was entitled to reach the following conclusions: The cord found around Mr. Freiri's neck came from the venetian blind in defendants [sic] apartment, and defendant was responsible for bringing it to Mrs. Caton's house. Defendant was also responsible for bringing the knife used to stab Mrs. Caton and Mr. Freiri. Defendant knew his intended victims were elderly and that Mr. Freiri was partially paralyzed, and so he could not have believed he and Cullumber, both younger men, needed the knife to commit the robberies. Therefore, defendant intended to kill, and not just rob, Mrs. Caton and Mr. Freiri. Moreover, defendant knew he could not escape justice if Mr. Freiri were left alive. Defendant had gained entry by saying he needed to use the phone because Cullumber was going to jail. Even if Mr. Freiri did not recognize defendant, he must have known Cullumber, who was an almost daily visitor to his grandmother's home. Mr. Freiri would have led the police to Cullumber, and Cullumber would have led them to defendant.

*Id.*

Though the decision on Dickey's direct appeal did not address the *Napue* claim premised on the number of pretrial meetings Buchanan had with Hahus, *id.*, the State did not contest at oral argument before our court that the prosecutor knowingly failed to correct Buchanan's false or misleading testimony that he met with Hahus only "a couple of times" before trial. We therefore assume the California Supreme Court denied Dickey's *Napue* claim regarding Buchanan's pretrial meetings with Hahus on the merits, *see Cullen*, 563 U.S. at 187–88; *Richter*, 562 U.S. at 99–100, and in light of Hahus's post-trial testimony that he met with Buchanan "probably a dozen times before the trial," we assume the California Supreme Court relied on materiality.**[8]**

---

[8] Contrary to its position at oral argument, the State's brief suggests Hahus had no duty under *Napue* to correct Buchanan's statement that personnel from the prosecutor's office had not given him "a single thing." This suggestion seems to be premised on the theory that because the State had produced the housing agreement, defense counsel could have cross-examined Buchanan and established that his testimony was false. The only authority the State cites for its argument that "failure to disclose" is a "necessary part of [a] *Napue* claim" is a footnote in *Imbler v. Pachtman*, 424 U.S. 409 (1975). In that footnote, the Supreme Court merely made the point that *Napue* violations can be reframed as *Brady* violations if the prosecution does not disclose evidence that shows testimony is false. *See Imbler*, 424 U.S. at 431 n.34. The State's suggestion that there was no *Napue* violation here is unsupported by Supreme Court authority and contrary to our decision in *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("[T]he government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false."). *See also Soto v. Ryan*, 760 F.3d 947, 968 n.11 (9th Cir. 2014)*; Sivak v. Hardison*, 658 F.3d 898, 909 (9th Cir. 2011); *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003). We agree with the California Supreme Court's conclusion that the prosecutor did not fulfill his duty to correct Buchanan's false and misleading testimony. *See Napue*, 360 U.S. at 269–70.

C

Two backdrops inform our analysis of Dickey's penalty-phase *Napue* claims. The first is the egregious lie Buchanan told Hahus, months before trial, that another prosecutor in Hahus's office had agreed to drop felony charges against him and keep that deal off the record so Dickey's counsel would not learn of it. The prosecutor's failure to produce his notes of their conversation is the basis of one of Dickey's *Brady* claims. The episode is a critical backdrop to the *Napue* claim because it put Hahus on notice that Buchanan was willing to lie if doing so served his own interests, even if the lie concerned a matter of considerable importance and even if the lie would inevitably be discovered.

The second backdrop for Dickey's *Napue* claims is the undeniable centrality of Buchanan's testimony to the State's special-circumstances case. The State's case for imposition of the death penalty depended on showing that Dickey harbored an intent to kill, and by Hahus's admission, "[t]he special circumstance finding came from the testimony of Buchanan." Dickey points to the State's thin circumstantial evidence of his role, and argues that the entire basis for the State's argument that he harbored an intent to kill was Buchanan's testimony attributing to Dickey the thought: "if you kill one you might as well kill them both." Buchanan was clear that this was something Dickey thought, not something he said when the crimes were committed, but the meaning and circumstances under which Dickey allegedly had this thought were never explained. Importantly, Goldman's account of the conversation she had with Dickey in the bedroom of the Harvard Avenue apartment made no mention of Dickey expressing this thought.

The importance of Buchanan's testimony was not lost on the trial court. In response to Dickey's mid-trial motion for acquittal based on insufficient evidence, the court discussed with counsel whether Buchanan's testimony regarding Dickey's thought was sufficient by itself to show intent to kill. In response, Hahus initially pointed to evidence that either Cullumber or Dickey took weapons with them on the night of the murder and argued such evidence also "clearly show[ed] intent to kill." But Hahus backtracked moments later and clarified that he "misspoke" and that "[t]he physical evidence [was] not directed at the intent to kill" but rather "show[ed] an aiding or abetting in the deaths." Before our court, however, the State backtracks again and argues that the California Supreme Court reasonably relied on both the physical evidence and Goldman's testimony as supporting the State's case that Dickey acted with the requisite intent to kill.

There is no question the State's case that Dickey acted with intent to kill was weak and circumstantial. There was no direct testimony or physical evidence of Dickey's involvement in the killing of either Caton or Freiri. The State identified Dickey's thumbprint on a blind collected from the Harvard Avenue apartment, but it is neither surprising nor incriminating that Dickey's thumbprint would be found on a blind taken from the home where he lived,[9] and the State's expert was unable to conclude a cord sample

---

[9] Investigator Mike Hall was able to locate and lift only one identifiable fingerprint from a slat on the venetian blind, and it matched Dickey's thumbprint. Dickey testified that his thumbprint was on the slat of the blind because he picked it up when it fell off the door and he placed it in the hall closet.

from the Harvard Avenue apartment blinds matched the cord used in the crime.

The circumstantial evidence that Dickey took a weapon to Caton's house was scant and contradicted. Detective Stokes testified that Goldman told him she saw Dickey remove a knife from the silverware drawer on the night of the murders, but the jury heard Goldman's testimony that she saw Dickey *look* in a drawer, that she was not sure which drawer, and that there was nothing unusual about Dickey's behavior. Goldman did not testify that she saw Dickey take a knife—or anything else—from the kitchen drawer on the night of the murders. Buchanan testified that the knife found at Caton's house looked similar to one Goldman owned and that he had last seen that knife lying on a bed at the Harvard Avenue apartment. This certainly implied that the knife used in the murders may have come from the Harvard Avenue apartment, but Buchanan's statement about the knife does not account for Goldman's sworn testimony that she told Stokes that: "[My knife] is in storage with all my stuff that I have in storage."[10]

Worse for the State, Detective Stokes testified that Goldman told him Dickey retrieved a blind from the hall closet on the night of the murders, but the jury heard Goldman's recorded pretrial testimony that she saw *Cullumber*, not Dickey, get a blind out of the hall closet and take it into the bedroom. Detective Stokes's testimony also conflicted with Goldman's concerning the origin of the missing cord; he testified that Goldman told him the blind from the hall closet was missing a cord, but Goldman

---

[10] The California Supreme Court's opinion did not mention Goldman's testimony that her knife was in storage. *See Dickey*, 111 P.3d at 928–29.

testified the blind from the bedroom was missing a cord. And as explained, the jury heard criminalist Gary Cortner testify that he could not conclude the cord found at the crime scene was the same cord or from the same spool as any of the samples taken from the blinds at the Harvard Avenue apartment.

The record provides little support for the State's argument that Goldman's testimony provided evidence that Dickey acted with intent to kill. Much of Goldman's actual testimony was not favorable to the prosecution, and the State relied heavily on Detective Stokes's account of what Goldman told him about the night of the murders. *See Dickey*, 111 P.3d at 929. Stokes's testimony was problematic for the State, not only because it was contradicted in several key respects by Goldman's pretrial testimony, but also because Stokes was forced to retract some of it. Most notably, the jury heard Stokes testify in some detail that Goldman told him she overheard Cullumber and Dickey talking about an "easy ripoff" and "money being hid" while getting dressed to go out together on the night of the murders. But Stokes acknowledged on cross-examination that Goldman had never said these things and abruptly recanted this part of his testimony:

> Q. *And yesterday you testified that she -- that she said she heard them talk about an easy ripoff?*
>
> A. *Yes.*
>
> Q. *That's not in your report, is it?*
>
> A. *Not in this area, no.*

Q. *Is it -- attributed as a statement from Gail [Goldman], is that in your report anywhere?*

A. *No.*

Q. *Gail [Goldman] didn't say that, did she?*

A. *No.*

Q. *Gail [Goldman] didn't say she saw anybody getting dressed to go out, did she?*

A. *Getting dressed to go out?*

Q. *Yeah, putting on hats and gloves and stuff like that?*

A. *No.*

Q. *That was your testimony yesterday, wasn't it?*

A. *Yes.*

Q. *That was wrong, wasn't it?*

A. *Yes.*

In short, this is not a case in which the State's star witness had credibility problems that were rendered harmless by physical evidence or the testimony of other witnesses. Buchanan's ambiguous statement that Dickey thought to himself—at some point, before or after the murders—"if you kill one you might as well kill them both" was the State's best evidence that Dickey acted with intent to kill, and Buchanan's testimony on this point was unsupported by other evidence. As Hahus testified at the hearing on Dickey's motion for a new trial, "[t]he special circumstance finding came from the testimony of Buchanan." Because Buchanan was the only one who testified that Dickey

expressed that thought, Buchanan's credibility was absolutely critical to the State's special-circumstances case.

On multiple occasions, the Supreme Court has found perjured testimony material under *Napue* when it bore on the credibility of a witness upon whom "the Government's case depended almost entirely." *Giglio*, 405 U.S. at 154. In *Napue* itself, for example, the Court concluded the perjured testimony was material because it concerned the credibility of the State's "principal witness," whose testimony "was extremely important because the passage of time and the dim light [at the scene of the crime] made eyewitness identification very difficult and uncertain, and because some pertinent witnesses had left the state." 360 U.S. at 265–66; *see also Giglio*, 405 U.S. at 154–55 (finding *Napue*'s materiality standard satisfied when a prosecutor falsely stated the State's star witness had not been promised immunity because this evidence "would be relevant to [the witness's] credibility and the jury was entitled to know of it"); *Alcorta*, 355 U.S. at 29–32 (finding *Napue* violation material because correcting false testimony from the only eyewitness to a murder would have impeached his credibility and corroborated the defendant's "sudden passion" defense).

Here, the California Supreme Court concluded the State's failure to correct Buchanan's false and misleading testimony about his housing-on-credit arrangement was immaterial because the jury already knew of the arrangement and Buchanan's desire to obtain the $5,000 reward. *Dickey*, 111 P.3d at 937–38. The court also noted that the jury heard evidence of Buchanan's drug addiction and that Buchanan and Dickey intensely disliked each other. *Id.* at 931, 937–38. The State argues on appeal that the California Supreme Court's materiality finding was reasonable because "there was already ample impeachment of Buchanan's credibility

before the jury," including (1) Buchanan's chronic use of illegal drugs; (2) the fact that he admitted using drugs close to the time he heard Dickey's statement to Goldman in the bedroom; (3) Buchanan's motivation to get the $5,000 reward; and (4) Buchanan's admitted antipathy toward Dickey.

We disagree.   Our starting point is recognition of Buchanan's role as the State's star witness.  In *Napue,* the Supreme Court held that false and misleading testimony from the State's star witness was not rendered cumulative or insignificant merely because the jury already had other reasons to distrust the witness.  *See Napue*, 360 U.S. at 270. The prosecutor in *Napue* failed to correct the State's primary witness's false testimony that the State's Attorney had not promised him consideration in exchange for his testimony. *Id.* at 266–67.  The Illinois Supreme Court had ruled that the prosecutor's misconduct was immaterial because "the jury had already been apprised that someone whom [the witness] had tentatively identified as being a public defender 'was going to do what he could'" to help the witness, and "'was trying to get something [done]' for him."  *Id.* at 268.  The Supreme Court reversed.  The Court explained, "[W]e do not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one."  *Id.* at 270.

In the case before us, to conclude Buchanan's false and misleading testimony was harmless, it was necessary for the state court to decide there was no reasonable likelihood that his testimony *could* have made a difference to the jury's imposition of the death penalty.  The California Supreme Court did not expressly acknowledge Buchanan's pivotal role at trial, but we must assume this was factored into its

materiality analysis.  The state court's decision did recognize that Hahus "knowingly exploited" Buchanan's false and misleading testimony about his housing arrangement by repeatedly relying on it to bolster Buchanan's otherwise tarnished credibility, *see Dickey*, 111 P.3d at 937, and the court's materiality ruling considered that the prosecutor's closing argument contrasted Buchanan's testimony that he received no favors from the prosecution with his testimony that the defense investigator bought him things like beer, lunch, and a pair of shoes, *id.* at 938.  The court did not acknowledge Buchanan's false testimony, in answer to Hahus's leading question, that he had met with Hahus only "a couple of times."  *Id.* at 937–38.

The state-court decision analyzed Buchanan's false and misleading testimony only as cumulative evidence that Buchanan was biased against Dickey and motivated to ensure his conviction.  Evidence that Buchanan had actually lied on the witness stand was an entirely new category of impeachment evidence that could have gutted the State's use of § 128 to shore up Buchanan's credibility.  It would have given the jury reason to doubt Buchanan's *veracity* in court—not just his reliability as an addict, or his impartiality as a person motivated by a reward.  None of the evidence the state court identified in its materiality analysis gave the jury reason to know that Buchanan was willing to lie to them under oath—or to know that he *had* lied to them under oath.  The significance of the State's star witness having done so, immediately after being advised in open court of the stark consequences of § 128, is hard to overstate.  Hahus's deliberate solicitation of, and failure to correct, Buchanan's false testimony was entirely contrary to *Napue*'s directive that courts safeguard the "truth-seeking function of the trial process."  *Agurs*, 427 U.S. at 103.

The State argues the state court could have reasonably decided that, if the jury had learned about the prosecution's role in Buchanan's housing arrangement, the jury would have simply "concluded that the prosecutor's office has a generally applicable policy to offer non-monetary housing assistance for its witnesses before the trial" and that "any housing assistance was for the purpose of keeping track of witnesses, not as an inducement to stray from the [] duty to testify truthfully." Regarding the number of pretrial meetings with Hahus, the State contends the court's materiality finding was reasonable because the jury still would have concluded that Buchanan was "neither prepared nor scripted" because his trial testimony was "fraught with inconsistencies, tangents and biases." But the Supreme Court has emphasized the opposite.

The Court has explained that, when considering materiality under the more demanding *Brady* standard, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* The other inconsistencies and evidence of Buchanan's bias therefore reinforce the conclusion that, if the jury had known that at least some of Buchanan's testimony had in fact been false, it could have easily made a difference to the outcome. Even "subtle factors" may be enough to find *Napue* materiality when "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Napue*, 360 U.S. at 269. Here, the jury's special-circumstances finding certainly turned on its assessment of Buchanan's veracity.

In light of Buchanan's pivotal role at trial and the weak evidence that Dickey acted with intent to kill, we are persuaded that this is the rare case in which AEDPA's

deferential standard is satisfied. The conclusion that there was no reasonable likelihood that correcting Buchanan's false testimony could have changed the jury's special-circumstances decision was both clearly incorrect and an objectively unreasonable application of clearly established federal law.

## D

On de novo review of Dickey's *Napue* claim, we reach the same result. *See Panetti*, 551 U.S. at 953; *Jones*, 52 F.4th at 1115. The prosecution's failure to correct Buchanan's false and misleading testimony was material because Buchanan's testimony was the centerpiece of the State's case in support of the special-circumstances finding. We can see no room to doubt that, if the jury had known Buchanan testified falsely, there was a reasonable likelihood that this could have affected its decision to impose a capital sentence. *See Agurs*, 427 U.S. at 103; *Bagley*, 473 U.S. at 678 (opinion of Blackmun, J.). This conclusion accords with our circuit precedent holding that "[t]here is a substantial difference between 'general evidence of untrustworthiness and specific evidence that a witness has lied.'" *Sivak*, 658 F.3d at 916 (quoting *Benn v. Lambert*, 283 F.3d 1040, 1056–57 (9th Cir. 2002)); *see also Jackson v. Brown*, 513 F.3d 1057, 1077 (9th Cir. 2008) (finding *Napue* materiality because revealing a key witness's "obvious willingness to lie under oath" would have "cast doubt on his entire testimony"). As we explained in *Sivak*, correcting a witness's false sworn testimony can make a powerful difference in the jury's assessment of the witness's trustworthiness:

> [I]f a witness's false testimony is corrected
> by the prosecution, his "willingness to lie
> under oath" is exposed and his credibility is

irreparably damaged. There is a substantial difference between "general evidence of untrustworthiness and specific evidence that a witness has lied." "All the other evidence used by the defense to punch holes in the informant's credibility amount[s] only to circumstantial reasons why the informant might alter the truth to continue to feather his own nest. A lie would be direct proof of this concern, eliminating the need for inferences."

658 F.3d at 916 (second alteration in original) (citations omitted) (first quoting *Jackson*, 513 F.3d at 1077; then quoting *Benn*, 283 F.3d at 1056–57; and then quoting *id.* at 1057). Here, if Hahus had corrected Buchanan's testimony, there is clearly a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

We are particularly troubled that Hahus used leading questions to elicit Buchanan's false testimony. Unlike *Napue* violations in cases where witnesses have unexpectedly blurted out a misstatement or surprised a prosecutor with an embellished or volunteered response, Buchanan's false and misleading testimony came in the form of affirmative answers to Hahus's prompts—hence, the California Supreme Court's apt description that the prosecutor's closing argument "sought to exploit the false impression he had *created*." *Dickey*, 111 P.3d at 938 (emphasis added). Given the weight the prosecutor put on Buchanan's credibility in his closing argument, imploring the jury that Buchanan deserved for them to believe him, and the prosecutor's frank assessment at the post-trial hearing that Buchanan's testimony comprised nearly the entirety of

the State's evidence of intent to kill, we do not hesitate to conclude there was a reasonable likelihood that the State's failure to correct Buchanan's testimony could have affected the jury's special-circumstances finding.**11**  We therefore reverse the district court's decision as to Dickey's penalty-phase *Napue* claim and do not reach the merits of any of Dickey's other penalty-phase claims.

# V

We affirm the denial of Dickey's certified guilt-phase claims related to his conviction for aiding and abetting the

---

[11] To grant habeas relief on a claim of trial error, we generally assess the error's prejudicial effect under *Brecht v. Abrahamson*, which requires "actual prejudice."  507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1519 (2022).  We recognize, however, that the circuits have split on whether the *Brecht* standard applies when reviewing a state court's *Napue* determination.  *Compare Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 150 (3d Cir. 2017) (declining to apply *Brecht* to a claim of *Napue* error), *and Hayes*, 399 F.3d at 984, *with United States v. Clay*, 720 F.3d 1021, 1026–27 (8th Cir. 2013) (applying *Brecht* to a *Napue* claim), *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1111–13 (11th Cir. 2012), *Rosencrantz v. Lafler*, 568 F.3d 577, 587–90 (6th Cir. 2009), *Douglas v. Workman*, 560 F.3d 1156, 1173 n.12 (10th Cir. 2009) (per curiam), *and Gilday v. Callahan*, 59 F.3d 257, 268 (1st Cir. 1995).  Our circuit has continued to apply the materiality standard specific to *Napue* claims, reasoning that "there is no need to conduct a separate harmless error analysis" when "the required finding of [*Napue*] materiality necessarily compels the conclusion that the error was not harmless."  *Hayes*, 399 F.3d at 984 (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).  Regardless, applying *Brecht* would not change our materiality conclusion here because the State's failure to correct Buchanan's false testimony leaves us with "grave doubt" about whether the error had "substantial and injurious effect or influence in determining the jury's verdict."  *Davis v. Ayala*, 576 U.S. 257, 268 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

underlying robbery. Dickey makes five claims relevant to the guilt phase: (1) the State violated *Napue* by knowingly using false testimony; (2) the State withheld favorable and material evidence in violation of *Brady*; (3) his trial counsel, Marvin Schultz, rendered ineffective assistance of counsel by failing to investigate and impeach Buchanan and, relatedly, by failing to interview and call Strickland as a witness regarding the housing arrangement; (4) Schultz was ineffective for seeking to empanel a pro-death jury; and (5) Schultz was ineffective for failing to withdraw as counsel due to an irreconcilable conflict with Dickey.[12]   The California Supreme Court rejected the first three of these claims on direct review. *See Dickey*, 111 P.3d at 936–38, 937 n.9. Dickey raised the first four claims in his first state habeas petition and the last claim in his second petition. The California Supreme Court denied all five claims on the merits without offering its reasoning.

We first conclude the state court reasonably determined that the State's *Napue* and *Brady* violations were not material to the jury's guilt-phase verdict and that Schultz's failure to investigate and impeach Buchanan was not prejudicial in the guilt phase. Unlike the special-circumstances finding, Buchanan did not provide the only key evidence of Dickey's participation in the robbery and burglary. Goldman's statements corroborated some of

---

[12] Dickey also argues, based on the facts underlying the fifth claim, that: (1) the trial court erred by failing to conduct a *Marsden* hearing and order substitute counsel for the penalty phase when it learned after the guilt phase that Dickey's relationship with Schultz had deteriorated; and (2) Schultz rendered ineffective assistance of counsel by failing to know the law regarding *Marsden* or request substitute counsel for Dickey. Because we grant relief on Dickey's *Napue* claim pertaining to imposition of the death penalty, we do not reach these claims.

Buchanan's testimony and linked Dickey to the crimes. For example, Goldman's observations of Dickey on the night of the crimes corroborated Buchanan's testimony that Dickey admitted going to Caton's house to steal money. Goldman also corroborated Buchanan's testimony that Cullumber and Dickey left the apartment together and did not have any money, but when they returned, one or both of them had money. Both Buchanan and Goldman recalled that two days after the crimes, Dickey confessed that he and Cullumber went to Caton's house to steal money and when Dickey was in the bedroom of the house, he heard a commotion and then saw Freiri slumped over in a chair.

Because Buchanan was not the sole witness who provided critical evidence that Dickey confessed to Goldman that he aided and abetted the robbery and burglary, the California Supreme Court did not unreasonably determine that there was no reasonable likelihood the prosecution's *Napue* and *Brady* violations could have changed the jury's guilty verdicts. For the same reason, the California Supreme Court reasonably concluded that Schultz's failure to investigate and impeach Buchanan and his failure to call Strickland as a witness regarding the housing arrangement did not result in guilt-phase prejudice. *See Richter*, 562 U.S. at 105; *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Separately, we conclude the California Supreme Court could have reasonably determined that Dickey failed to show guilt-phase prejudice stemming from Schultz's strategy of seeking to select jurors who were predisposed to vote for the death penalty. Schultz explained that he pursued this strategy because he felt that jurors who "tend to be more pro death once they f[ind] guilt" also "demand[] they be absolutely positively convinced of the defendant's guilt" and

therefore are "more demanding of the quantum and quality of prosecution evidence" during the guilt phase.  Because the California Supreme Court did not address this claim on direct review, we consider what arguments could have supported the court's rejection of the claim.  *See Richter*, 562 U.S. at 99–102.   Dickey asserts that he need not show prejudice because Schultz's jury-selection strategy falls under an exception to the *Strickland* prejudice requirement that applies when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  *See United States v. Cronic*, 466 U.S. 648, 659 (1984).  But the exception Dickey relies upon is only applicable "when the attorney's failure to oppose the prosecution goes to the proceedings *as a whole*—not when the failure occurs only at specific points in the trial."  *Gallegos v. Ryan*, 820 F.3d 1013, 1034 (9th Cir. 2016) (emphasis added) (quoting *United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005)).   Assuming that Schultz's strategy constituted deficient performance, Dickey therefore still must show the strategy resulted in prejudice.

Dickey argues that Schultz's strategy was prejudicial because studies have found that pro-death-penalty jurors are also more prone to vote for conviction.[13]  Without more, this speculative argument is insufficient.  Establishing prejudice "in the context of juror selection" requires a "showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who

---

[13] Dickey also suggests that Schultz's strategy was prejudicial because it resulted in a jury that was not "reflective of a cross-section of society." This argument is foreclosed by the Supreme Court's decision in *Lockhart v. McCree*, which held that the representative cross-section requirement does not apply to petit juries.  476 U.S. 162, 174 (1986).

was biased." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004). A juror is biased if he or she has "such fixed opinions that [he or she] could not judge impartially the guilt of the defendant." *United States v. Quintero-Barraza*, 78 F.3d 1344, 1349 (9th Cir. 1995) (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)). All seated jurors in Dickey's trial stated they could "follow the law and the trial court's instructions; put aside personal feelings and remain open-minded and consider all facts and circumstances of the crimes in making the penalty determination; and stated that the possibility of a death sentence would not affect his or her guilt phase determination." *Dickey*, 231 F. Supp. 3d at 671; *see also Lockhart*, 476 U.S. at 178 (rejecting the argument that a jury composed of jurors willing to impose the death penalty is biased because "an impartial jury consists of nothing more than 'jurors who will conscientiously apply the law and find the facts'" (emphasis omitted) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985))). We therefore conclude the California Supreme Court could have reasonably determined that Dickey failed to show guilt-phase prejudice resulting from Schultz's jury-selection strategy.[14]

Third, we conclude the California Supreme Court could have reasonably denied Dickey's claim that Schultz should have withdrawn based on an irreconcilable conflict. The

---

[14] The State asserts that Dickey's claim that Schultz's strategy resulted in a biased jury is procedurally barred because it was not timely presented in state court. We do not address the State's argument because we conclude this claim fails on the merits. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are . . . clearly not meritorious despite an asserted procedural bar."); *see also Ayala v. Chappell*, 829 F.3d 1081, 1095–96 (9th Cir. 2016).

Supreme Court "has never held that an irreconcilable conflict with one's attorney constitutes a per se denial of the right to effective counsel," *Carter v. Davis*, 946 F.3d 489, 508 (9th Cir. 2019) (per curiam), and Dickey does not identify how Schultz's failure to withdraw prior to the guilty verdict resulted in prejudice. Because AEDPA "conditions habeas relief on a determination that the state-court decision unreasonably applied 'clearly established Federal law' as pronounced by the U.S. Supreme Court," Dickey is not entitled to relief on this claim. *Id.* (quoting 28 U.S.C. § 2254(d)(1)).

## VI

We reverse and remand to the district court with instructions to grant a conditional writ of habeas corpus as to the special-circumstances findings and the imposition of the death penalty. The State may either grant Dickey a new trial on the special-circumstances allegations within ninety days or agree that he may be sentenced to a penalty other than death in conformance with state law. *See Phillips v. Ornoski*, 673 F.3d 1168, 1197 (9th Cir. 2012). We affirm the district court's holding as to Dickey's certified guilt-phase claims, but do not reach the merits of any of Dickey's uncertified guilt-phase claims or his non-*Napue* penalty-phase claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**[15]

---

[15] Costs are taxed against the State. *See* Fed R. App. P. 39(a)(4).