Filed 12/5/24  P. v. Dickey CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>COLIN RAKER DICKEY,<br><br>　　　Defendant and Appellant. | F087733<br><br>(Super. Ct. No. CF90416903)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

McBreen & Senior, David A. Senior and Ann K. Tria for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Tami M. Krenzin and Justain P. Riley, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

The trial court resentenced defendant Colin Raker Dickey after he obtained relief on a petition for writ of habeas corpus brought in federal court. (See *Dickey v. Davis* (2023) 69 F.4th 624; *Dickey v. Davis* (E.D. Cal. Sept. 7, 2023, No. 1:06-cv-00357-JLT-SAB) 2024 U.S. Dist. Lexis 91052 [2024 WL 2300965].) Defendant appeals from the judgment of conviction and sentence entered following resentencing. He contends (1) resentencing was not conducted within the time required by the orders of the federal courts and he therefore is entitled to immediate release; (2) in light of the federal courts' determinations, he was not convicted of murder under current California law and therefore could not be resentenced for murder in conformity with state law; and (3) imposition of consecutive sentences on resentencing was vindictive.

We affirm.

## FACTUAL BACKGROUND

The facts underlying the offenses do not bear on our resolution of the legal issues raised on appeal. Nonetheless, the opinion of the United States Court of Appeals for the Ninth Circuit (hereinafter "Ninth Circuit") is pertinent to understanding the status of defendant's current convictions and defendant's arguments regarding their validity. Accordingly, we recite the facts as summarized in the Ninth Circuit's opinion.

"A

"Marie Caton and Louis Freiri were attacked at Caton's Fresno, California residence in November 1988. [Citation.] Caton's daughter, [L.G.[1]], went to check on her mother on November 8 and discovered Caton unconscious in her bedroom. [Citation.] Caton had been beaten and had multiple stab wounds. [Citation.] She died of her injuries eleven days later. [Citation.] [L.G.] found Freiri dead from stab wounds in the archway between the dining room and the living room. [Citation.] When the police arrived, they discovered two suspicious knives in Caton's kitchen and a

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

2.

venetian blind cord wrapped around Freiri's neck. [Citation.] The venetian blinds in Caton's house were all intact, and no usable fingerprints were found at the scene of the crime. [Citation.] [L.G.] told the police that she suspected her son, Richard Cullumber, had attacked Caton and Freiri. [Citation.] [L.G.] explained that Cullumber was a drug addict who frequently asked Caton for money, and that Caton was known to hide large amounts of cash throughout her house. [Citation.]

"Cullumber lived in an apartment on Harvard Avenue in Fresno with [defendant] and four other roommates, including Gail [G.] and Richard [B.]. [Citation.] Cullumber's roommates told the police that Cullumber had packed a bag and left the apartment on the night of the murders. [Citation.] Five days later, Cullumber commandeered a car after the police tried to stop him, warning the driver: 'I need the car; I've already killed a woman.' [Citation.] He was cornered after a high-speed chase and killed himself with a pistol registered to Freiri. [Citation.]

"Several months after the murders, [Richard B.] saw a flyer at a convenience store announcing that Caton's relatives were offering a $5,000 reward for information leading to conviction of the perpetrator of the murders.[2] [Citation.] [Richard B.] left his name with the store clerk, and he was put in touch with Detective [D.] Stokes. [Citation.] [Richard B.] told Stokes that [defendant] had been involved in the murders, and Stokes circled back to the Harvard Avenue apartment to continue his investigation. Stokes spoke to [Gail G.], who had initially denied knowing anything about the murders. [Citation.] This time, she shared more information about events that night. [Citation.]

"[Gail G.] died before the trial began, but her sworn testimony from [defendant's] preliminary hearing was read into the record at trial.[3] [Citation.] In her preliminary hearing testimony, [Gail G.] said that on the night of the murders she saw Cullumber take a venetian blind out of the hall closet in their apartment and go into the bedroom with it. [Citation.] Later, she noticed the blind had been returned to the closet and a blind in the bedroom was missing a cord. [Citation.] [Gail G.] said that she saw [defendant] walk into the kitchen that same night and open a drawer.

[2] "The reward was originally $3,000 but was later raised to $5,000."

[3] "The State also presented testimony from Detective Stokes, who gave his account of what [Gail G.] told him during the investigation. [Citation.] Stokes's version of [Gail G.'s] account differed from [Gail G.'s] own testimony in several respects. [Citation.]"

[Citation.]  She initially testified that [defendant] looked in a knife-and-silverware drawer, but she later clarified that she did not see which drawer [defendant] had opened.  [Citation.]  According to [Gail G.], [defendant] and Cullumber soon left the apartment.  [Citation.]  [Gail G.] believed the men had no money when they left because Cullumber had asked her for money to buy cigarettes.  [Citation.]  When the two men returned to the apartment later that evening, Cullumber packed his bags, gave [Gail G.] $40 or $50 in cash to repay a debt, and left.  [Citation.]  [Gail G.] testified that when Detective Stokes showed her one of the knives found at Caton's home, she told him, 'I have a knife exactly like that knife, or they are twins[,] . . . . [b]ut mine is in storage with all my stuff that I have in storage.'  When the prosecutor followed up by asking whether she had 'a knife exactly like that in the apartment on Harvard,' [Gail G.] responded, 'I -- yes,' without specifying when the knife was at the apartment or whether it was at the apartment but in storage on the night of the murders.

"[Gail G.] also testified that she and [defendant] were watching the news together shortly after the murders and saw a story reporting that Freiri was dead and Caton was still alive but near death.  [Citation.]  [Defendant] became upset and told [Gail G.] that he wanted to talk to her in the bedroom, and [Richard B.] followed them.  [Citation.]  In the bedroom, [defendant] told [Gail G.] that he had accompanied Cullumber to Caton's house to 'help [him] get the money,' but he had nothing to do with the two murders.  [Citation.]  [Gail G.] recalled [defendant] saying that Cullumber had assured him 'nothing was going to happen,' and that at Caton's house, [defendant] searched for money in Caton's bedroom with Caton present.  [Citation.]  When [defendant] stepped out of Caton's bedroom, he saw Freiri slumped over in a chair in the living room and 'knew something had happened.'  [Citation.]  Cullumber then 'went beserk' and 'came into the bedroom and started beating up on [Caton].'  [Citation.]  The two men found $700, which they split.  [Citation.]

"[Defendant] was charged in Fresno County Superior Court with robbery, burglary, and aiding and abetting murder.  [Citation.]  He pled not guilty to all the charges.  [Citation.]  There was no physical evidence linking [defendant] to the crime scene and no living witnesses to the crime.  The State did not argue at trial that [defendant] killed Caton or Freiri.  It argued only that he was guilty under an aiding-and-abetting theory.  [Citation.]  The State sought the death penalty and alleged a number of special circumstances that allowed imposition of the death penalty under California law.  [Citations.]  The jury was instructed that in order to find any of the special circumstances true, it must find that [defendant]

"intended either to kill a human being or to aid another in the killing of a human being."

"B

"[Gail G.'s] preliminary hearing testimony was read to the jury, but her death left [Richard B.] as the State's primary living witness at trial.

"[Richard B.'s] trial testimony mirrored [Gail G.'s] preliminary hearing testimony in some respects. He too testified that [defendant] and Cullumber left the apartment on the night of the murders, that they had no money when they left but had money when they returned, and that [defendant] saw a news story about the crime a couple days later and admitted that he had been involved in the robbery. [Citation.]

"But in key respects, [Richard B.'s] testimony was much more incriminating than [Gail G.'s]. He testified that it was [defendant], not Cullumber, who removed a cord from a venetian blind in the apartment on the night of the murders. [Citation.] He also told the jury that when he looked into the bedroom after [defendant] had returned a blind to the closet that night, he saw a knife identical to [Gail G.'s] on the bed. [Citation.] [Richard B.] added that when [defendant] and Cullumber had returned to the apartment, [defendant] asked [Richard B.] to take him and Cullumber for a drive. [Citation.] According to [Richard B.], [defendant] threw a pair of shoes and his jacket out the car window during the drive. [Citation.]

"[Richard B.] described following [Gail G.] and [defendant] into a bedroom at the Harvard Avenue apartment a couple days after the murders and hearing [defendant] tell [Gail G.] that:

"him and [Cullumber] had been over to [Cullumber]'s grandmother's house, and that they had entered the house -- how he had done it, how he had walked up to the door, knocked, faked like [Cullumber] was going to be in jail, needed to use the phone, and then [Cullumber] sneaked in, they were supposed to tie him them [sic] up, get this money and everything. And while [defendant] is supposedly in the bedroom looking for the money he hears a commotion, looked out the bedroom door, sees an elderly man with his head slumped down, considers him dead, and that if you kill one you might as well kill them both.

"When asked to clarify what he meant by the last statement, [Richard B.] said, '[Defendant] said that he—only what he thought, he didn't say what he did. He said that, "If you kill one you might as well kill them both." '

5.

[Citation.] According to [Richard B.], [defendant] 'didn't say he said it to [Cullumber], he just said it as that was his opinion.' [Citation.] Notably, in [Gail G.'s] preliminary hearing testimony recounting the conversation she had with [defendant] in the bedroom of the Harvard Avenue apartment, she said nothing at all about [defendant] making this statement.

"The jury heard testimony explaining that [Richard B.] did not come forward until he saw a flyer announcing the reward, several months after he heard [defendant's] conversation with [Gail G.]. [Citation.] [Richard B.] testified that he came forward because of his Christian upbringing, not because of the reward money. [Citation.] However, in her preliminary hearing testimony, [Gail G.] said that [Richard B.] told her he intended to turn in [defendant] so that he could collect the reward. [Citation.] The jury also heard testimony from [defendant], [Gail G.], and the defense investigator that [defendant] and [Richard B.] strongly disliked each other. [Citation.] The defense investigator testified that [Richard B.] mentioned his dislike for [defendant] every time they met, and [defendant] and [Richard B.] both testified that [Richard B.] was particularly angry with [defendant] because [defendant] had torn up the only photo [Richard B.] had of his youngest daughter. [Citation.] Adding to his credibility problems, [Richard B.] admitted at trial that he frequently used heroin and cocaine, that he had used drugs an hour or two before he heard [defendant] admit his involvement in the robbery, and that he had continued using drugs as recently as the day before his trial testimony.

"C

"The prosecutor, [K.] Hahus, labored throughout the trial to mitigate [Richard B.'s] credibility issues. To buttress [Richard B.'s] credibility, Hahus asked [Richard B.] to confirm on re-direct examination that he was aware of California Penal Code § 128, which provides that '[e]very person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole.' At Hahus's request, the trial court took judicial notice of that statute and read it aloud to the jury.

"Immediately after the trial court read § 128 aloud, Hahus asked [Richard B.] about his interactions with defense investigator [M.] King and whether King ever bought him anything. [Richard B.] testified that King bought him beer on about three occasions, lunch, and a pair of shoes. Hahus then asked [Richard B.] leading questions that compared [Richard B.'s] interactions with King to [Richard B.'s] interactions with the district attorney's office:

6.

"Q. At anytime have you spoken with anybody who's told you they were from my office, from the D.A.'s Office?

"A. No, sir, only when they've come to pick me up for court.

"Q. You've talked to me a couple of times; is that right?

"A. Yes, sir.

"Q. At anytime have the folks who've come to pick you up from my office or me, have we bought you anything?

"A. Not a single thing, sir.

"Hahus and [Richard B.] both knew this testimony was false, but Hahus made no move to correct it. Instead, in his closing argument, Hahus reminded the jury of this testimony, emphasizing that King, the defense investigator, was the 'only investigator who supplied [Richard B.] with money or alcohol.' In line with [Richad B.'s] false testimony that [Richard B.] and Hahus had met only 'a couple of times,' Hahus also argued in closing that '[i]t's pretty clear [Richard B.] was not prepared to testify, that he was not scripted to testify.'

"Hahus also acknowledged in his closing argument that there were multiple reasons to doubt [Richard B.'s] word. But he gave the jury his own opinion of [Richard B.'s] truthfulness: 'Do you think [Richard B.] would lie for $5,000? Maybe. Do you think [Richard B.] would lie to send a man to prison? I don't think so.' [Defendant's] lawyer objected, and the judge duly instructed the jury to ignore Hahus's statement.

"Hahus then emphasized to the jury that [Richard B.] knew that under [Penal Code] § 128 he could face life in prison or the death penalty for perjuring himself in a capital case. Hahus told the jury that [Richard B.] was a 'street-wise,' 'con-wise' drug addict, and a 'hype' who used hypodermic needles. But Hahus argued that [Richard B.] still 'deserves to have you listen to what he says when he comes into this courtroom':

"He's still a street person, he's still a con, he didn't change just because he heard a man admit to burglary, robbery and murder; he's still the same man. But that doesn't mean that the truth cannot come out of the mouth of a drug addict. It can come out of the mouth of a drug addict just as well as it can come out of the mouth of a priest.

"* * *

"Do you think [Richard B.] would lie to send a man to prison? Perhaps. Do you think [Richard B.] would lie to send a man to prison that he doesn't like? Even more perhaps. Do you think [Richard B.] would lie to send a man to prison behind a murder charge where [Richard B.] himself could face a capital case for it?

"There's honor among thieves. There's also something else; some things are more important than others, and even though he might be a sleazy hype, do you really think he made all this up for 5,000 bucks when it's this serious?" (*Dickey v. Davis*, *supra*, 69 F.4th at pp. 629–633, italics omitted.)

## PROCEDURAL HISTORY

### I.     Initial State Court Proceedings

On March 15, 1991, a jury convicted defendant on two counts of first degree murder (Pen. Code,[4] § 187, subd. (a)) with robbery-murder, burglary-murder, and multiple-murder special circumstances (§ 190.2, subd. (a)(3), (17)), as well as two counts of first degree robbery (§ 211), and one count of first degree burglary (§§ 459, 460).[5] He was sentenced to death. (*People v. Dickey* (2005) 35 Cal.4th 884, 894–899.)

In his automatic appeal, the California Supreme Court affirmed defendant's judgment of conviction and sentence. (*People v. Dickey*, *supra*, 35 Cal.4th at p. 894.) As relevant here, defendant challenged the sufficiency of the evidence supporting the special circumstance findings. (*Id.* at pp. 900–904.) First, defendant argued there was insufficient evidence to support a finding that he aided and abetted the killings themselves, as opposed to merely aiding and abetting the underlying felonies. (*Id.* at p. 901.) The high court rejected this argument, holding that the jury was not required to find defendant aided and abetted the actual killings to find the special circumstances true. (*Id.* at pp. 900–902.) Second, defendant argued the evidence did not support a finding that he had the requisite intent to kill the victims. (*Id.* at p. 903.) Relying in significant

_____

[4] Undesignated statutory references are to the Penal Code.

[5] We grant defendant's request for judicial notice of portions of the record on appeal in the Supreme Court case of *People v. Dickey*, case No. S025519.

part on Richard B.'s testimony, the high court determined the evidence was sufficient to support this finding. (*Id.* at pp. 903–904.)

On August 27, 2021, defendant filed a petition for resentencing pursuant to former section 1170.95 (now § 1172.6).[6] Following briefing and a hearing at which defendant was represented by counsel, the trial court denied the petition. This court affirmed. (*People v. Dickey* (Mar. 23, 2023, F084345) [nonpub. opn.].) In so doing, we relied on the high court's opinion in defendant's automatic appeal to conclude the jury's special circumstance findings established defendant had been convicted under a theory of murder that remains valid after the effective date of Senate Bill No. 1437. (*People v. Dickey*, F084345.) The California Supreme Court denied review. (*People v. Dickey* (June 21, 2023, S279466) [order].)

## II. Federal Court Proceedings

Meanwhile, defendant pursued a petition for writ of habeas corpus in federal court. "The [federal] district court denied relief on his guilt-phase claims in 2017, [citation], and denied relief on his penalty-phase claims in 2019, [citation]." (*Dickey v. Davis*, *supra*, 69 F.4th at p. 635.) However, the federal district court granted a certificate of appealability as to whether the prosecution knowingly used false evidence from Richard B. in violation of *Napue v. Illinois* (1959) 360 U.S. 264, and failed to disclose favorable impeachment evidence regarding benefits provided to Richard B. in violation of *Brady v. Maryland* (1963) 373 U.S. 83. (*Dickey v. Davis*, at p. 635.)

---

[6] Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) narrowed the felony-murder rule and added former section 1170.95 to provide a procedure for those convicted under the former law to seek relief. (*People v. Curiel* (2023) 15 Cal.5th 433, 449 (*Curiel*).) Former section 1170.95 later was amended in nonrelevant part (Sen. Bill No. 775 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2)), then renumbered section 1172.6, with no change in text. (Assem. Bill No. 200 (2021–2022 Reg. Sess.) (Stats. 2022, ch. 58, § 10)). We refer to the current section 1172.6 in this opinion.

On appeal from the denial of the petition, the Ninth Circuit held that defendant was entitled to habeas relief as to the jury's special circumstances findings and the imposition of the death penalty. The court explained:

> "This is an exceptional case in which the prosecutor deliberately elicited, and then failed to correct, false and misleading testimony from the State's star witness, [Richard B.]. The prosecutor went on to exploit [Richard B.'s] false testimony in his closing argument. He also failed to produce evidence to the defense team that would have seriously impeached [Richard B.'s] testimony. These points are uncontested; the central issue in this appeal is the materiality of the State's *Napue* and *Brady* violations.

> "To obtain the death penalty, the State was required to prove special circumstances, and the record makes clear that the State's special-circumstances evidence depended on [Richard B.'s] testimony. It also makes clear that the prosecutor recognized the jury would have ample reason to doubt [Richard B.]. To shore up [Richard B.'s] testimony, the State asked the court to read aloud a California statute that put [Richard B.] on notice that he would subject himself to the death penalty if he lied under oath and [defendant] was wrongfully convicted and executed. What the jury did not know—because the prosecutor did not correct the false testimony—is that [Richard B.] did lie to them under oath, even given the potential consequences for doing so in a capital case." (*Dickey v. Davis*, *supra*, 69 F.4th at pp. 628–629.)

The court further held it was objectively unreasonable for the California Supreme Court to decide, in defendant's automatic appeal, that (1) the prosecutor's conduct was immaterial to the jury's special circumstance findings and (2) correcting Richard B.'s false testimony could not have changed the jury's decision to impose the death penalty. (*Dickey v. Davis*, *supra*, 69 F.4th at p. 629.) After determining defendant was entitled to relief, the court reversed and remanded to the federal district court with instructions to grant a conditional writ of habeas corpus as to the jury's special circumstance findings and imposition of the death penalty. (*Ibid*.)

On September 7, 2023, the district court granted the conditional writ of habeas corpus as to the special circumstance findings and the imposition of the death penalty and ordered, "**[w]ithin 90 days**, the State of California may grant [defendant] a new trial on

10.

the special-circumstances allegations or agree that he may be sentenced to a penalty other than death in conformity with state law." (*Dickey v. Davis*, *supra*, 2024 U.S. Dist. Lexis 91052 [2024 WL 2300965].)

## III. Subsequent State Court Proceedings

In the intervening period between the Ninth's Circuit's opinion and the federal district court's order, the People notified defendant and the court that they did not intend to retry the special circumstance allegations.

At a hearing held on December 8, 2023, defense counsel argued defendant could not be resentenced for murder in conformity with state law because his murder convictions were no longer valid. More specifically, defense counsel reasoned that (1) this court previously affirmed the denial of defendant's section 1172.6 petition on the ground the special circumstance findings established he aided and abetted the underlying felonies with intent to kill and he was ineligible for resentencing on that basis; (2) the special circumstance findings since were eliminated by the Ninth Circuit's determination that they were materially tainted by *Napue* and *Brady* violations; and (3) no other basis appeared in the record to support the murder convictions under current law. Defense counsel argued only the six-year term for one of the robberies and concurrent terms on the remaining robbery and burglary counts remained, all of which had been served in full. The prosecutor argued that the murder verdicts were "still in play." The court noted that it lacked written briefing from both parties and ordered the parties to brief their positions on resentencing.

Defendant then filed a written motion to vacate the sentence and for immediate release. He argued the state had failed to timely agree to a sentence that would conform to state law, as defendant contended was required by the federal district court's order and Ninth Circuit's opinion, thus necessitating his immediate release from custody. He further argued he could not be resentenced on any of the offenses. Specifically, he argued he had served his sentences for robbery and burglary and those sentences therefore should

11.

be stayed or vacated. He also once again argued his murder convictions did not rest on a currently valid theory of murder and he therefore could not be resentenced for murder in conformity with state law.

The People opposed defendant's motion. They argued they had complied with the federal court's orders by timely agreeing to strike the special circumstance allegations and agreeing that defendant could be resentenced to a penalty other than death in conformity with state law. The People asserted the delays in resentencing were attributable to communications between the parties in which defendant requested that the People stipulate that defendant was entitled to have his murder convictions vacated pursuant to section 1172.6, and the People's evaluation of the case file in response to that request. Ultimately, however, the People determined they would not stipulate to defendant's resentencing pursuant to section 1172.6 and asked the court to sentence him to a term of 50 years to life. The People noted defendant had not complied with the requirements of section 1172.6 and therefore was not entitled to relief pursuant to that section.

A resentencing hearing was conducted on February 16, 2024. The court noted defendant had not filed a section 1172.6 petition and defense counsel stated no such petition was required. Defense counsel argued, "There is no murder conviction under State law." The court stated defendant still had two murder convictions, as well as two robbery convictions and a burglary conviction. The court opined that, to receive a determination that defendant's conduct no longer constituted murder under current law, "you have a [section] 1172.6 petition and you show that the People can not proceed with the case and . . . prove that he is guilty of murder now." The People noted that the Ninth Circuit left the murder convictions intact and agreed with the court that defendant's contentions should be resolved through the section 1172.6 procedure. The People also argued that resentencing based on the federal district court's order would not preclude defendant seeking section 1172.6 relief, and the People conceded that defendant was

12.

entitled to an evidentiary hearing under that section. However, the People argued they could still show that defendant was a major participant in the underlying felonies and acted with reckless indifference toward human life. Defense counsel again disagreed that a section 1172.6 petition was required. The court again noted that the murder convictions had not been vacated and defendant had not filed a section 1172.6 petition. The court declined to take further action with regard to the validity of the murder convictions, absent a section 1172.6 petition.

The court sentenced defendant to consecutive terms of 25 years to life on each of the two murders. Sentence on the remaining counts was imposed and stayed.

**DISCUSSION**

## I. Timeliness of Resentencing

Defendant contends the state did not pursue its right to resentence defendant prior to the expiration of the conditional writ. He contends this failure mandates his immediate release from custody.

As an initial matter, we note this argument is not properly presented. It is contained within a section of the opening brief titled, "Summary of the Significant Facts in the Record." (Boldface, underlining & some capitalization omitted.) California Rules of Court, rule 8.204(a)(1)(B) requires that each point be stated under a separate heading or subheading summarizing the point. Defendant's failure to comply with this requirement forfeits the issue on appeal. (*Herrera v. Doctors Medical Center of Modesto, Inc.* (2021) 67 Cal.App.5th 538, 547.)

Regardless, the argument is without merit. Defendant brought this same argument in federal court in a motion for release from custody. (*Dickey v. Davis* (E.D. Cal. May 21, 2024, No. 1:06-cv-00357-JLT-SAB) 2024 U.S. Dist. Lexis 91052, *1–2 [2024 WL 2300965].) The federal district court rejected defendant's argument and determined the conditional writ had been satisfied and was no longer operative. (*Id*. at p. *4.) Accordingly, defendant is not entitled to relief on this basis.

13.

## II. Validity of Sentences on the Murder Convictions

Defendant contends the trial court could not validly sentence him for murder in conformity with state law. He contends the Ninth Circuit's opinion disposing of the special circumstance findings eliminated the sole basis for upholding his murder convictions under current state law. He therefore contends there is no murder conviction available on which to sentence him. In effect, he contends his murder convictions were reversed or vacated by operation of law when the Ninth Circuit directed the federal district court to grant habeas relief on the special circumstance findings. On this basis, he contends the sentences on his murder convictions are unlawful.

As we explain below, defendant's murder convictions were left undisturbed by both the Ninth Circuit and the federal district court, and defendant has declined to avail himself of the procedures set forth in section 1172.6 for vacating those convictions. Accordingly, defendant remains convicted on two counts of murder and the sentences associated with those counts are not invalid.[7] If defendant wishes to pursue relief on his murder convictions, he must do so through the processes set forth in section 1172.6.

### A. Senate Bill No. 1437

Effective January 1, 2019, Senate Bill No. 1437 "altered the substantive law of murder in two areas." (*Curiel*, *supra*, 15 Cal.5th at p. 448.) First, the bill narrowed the scope of the felony-murder rule "so that a 'participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs' can be liable for murder only if '[t]he person was the actual killer'; '[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree'; or '[t]he person was a major participant in the underlying felony and acted with reckless indifference to

---

[7] Aside from his claim that consecutive sentences were vindictive, which is discussed below, defendant does not otherwise dispute that the sentence of 25 years to life was the appropriate sentence on each count of murder.

human life.' " (*People v. Arellano* (2024) 16 Cal.5th 457, 467–468, quoting § 189, subd. (e)(1)–(3).) Second, the bill "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine" by requiring that, "except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder." (*Curiel*, at p. 449, quoting § 188, subd. (a)(3).) Now, " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Curiel*, at p. 449.)

Additionally, Senate Bill No. 1437 added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense " 'to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel*, *supra*, 15 Cal.5th at p. 449.) Section 1172.6 provides two vehicles for relief. The first is the section 1172.6 petition process. Under this process, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) " 'If the petition and record in the case establish conclusively that the [petitioner] is ineligible for relief, the trial court may dismiss the petition.' " (*Curiel*, *supra*, 15 Cal.5th at p. 450.) "Otherwise, the court must issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill [No.] 1437 (§ 1172.6, subd. (d)(3)). In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.' (*Ibid*.) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' " (*People v. Wilson* (2023) 14 Cal.5th 839, 869 (*Wilson*).)

In addition to the foregoing, "[a] person convicted of murder . . . whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill [No.] 1437 . . . ." (§ 1172.6, subd. (g).) "The Courts of Appeal have handled claims under section 1172.6, subdivision (g) by finding retroactive error and reviewing for harmlessness. [Citations.] Unlike trial court proceedings on section 1172.6 resentencing petitions, parties on appeal are generally prevented from presenting new evidence to support their positions. While a defendant can elect to forgo the presentation of new evidence by pursuing a section 1172.6, subdivision (g) claim on appeal, the prosecution has no such choice. The filing of such a claim on appeal deprives the People of the statutorily conferred ability to submit additional evidence of the defendant's liability on a still-valid theory. [Citations.] Any unfairness to the prosecution, however, is mitigated by the different remedies available in the two proceedings. When an error asserted on appeal in a subdivision (g) claim is not harmless, the defendant is entitled only to *retrial* of the murder charge, not resentencing." (*Wilson*, *supra*, 14 Cal.5th at pp. 871–872.)

Our Supreme Court has acknowledged "uncertainties in how section 1172.6, subdivision (g) should operate," and has assumed, without deciding, that claims of retroactive error raised on appeal pursuant to section 1172.6, subdivision (g) are subject to harmless error analysis under the standard of prejudice applicable to alternative-theory error. (*Wilson*, *supra*, 14 Cal.5th at p. 872; see *People v. Aledamat* (2019) 8 Cal.5th 1, 13 [discussing standard of review for alternative-theory error].)

### B. Analysis

We reiterate that the federal courts left defendant's murder convictions undisturbed. Both the federal district court and the Ninth Circuit denied relief on defendant's guilt phase claims. (*Dickey v. Davis*, *supra*, 69 F.4th at pp. 629, 635.) The Ninth Circuit reversed the federal district court's denial of certain of defendant's certified penalty phase claims and remanded with "instructions to grant a conditional writ of

16.

habeas corpus as to the special-circumstances findings and the imposition of the death penalty." (*Id.* at p. 648.) The federal district court followed the Ninth Circuit's instructions precisely. (*Dickey v. Davis*, *supra*, 2024 U.S. Dist. Lexis 91052 [2024 WL 2300965].) Nothing in either court's opinion or orders purports to undermine the validity of defendant's murder convictions.

Furthermore, contrary to defendant's assertions, there is no procedure that automatically invalidates his murder convictions by operation of law in light of the statutory changes enacted through Senate Bill No. 1437. To the contrary, the Legislature set forth two exclusive avenues through which those convicted under the prior law can obtain relief: through the section 1172.6 petition process and, for those "whose conviction is not final," on direct appeal. (§ 1172.6, subd. (g); see § 1172.6, subd. (a); *Wilson*, *supra*, 14 Cal.5th at p. 869.)

Here, defendant repeatedly declined to avail himself of the section 1172.6 petition process in the trial court. No other vehicle was available for the trial court to consider the continuing validity of defendant's murder convictions. Accordingly, the trial court proceeded to resentence defendant to the punishment applicable under state law for the offense of murder. In so doing, the trial court did not err.

A more difficult question is whether defendant may pursue relief pursuant section 1172.6, subdivision (g) in the instant appeal. Defendant initially did not pursue relief pursuant to this section or subsection in this appeal. Defendant's opening brief mentions section 1172.6 only once, in reference to his prior petition. Instead, he argues in his opening brief that his sentences for murder must be set aside because his murder convictions *already* were rendered invalid. It is not until defendant's reply brief that he purports to seek relief pursuant to section 1172.6, subdivision (g). Even so, he does not seem to seek the remedy available to him pursuant to section 1172.6, subdivision (g), i.e., retrial. (*Wilson*, *supra*, 14 Cal.5th at pp. 871–872.) In any event, we generally do not

17.

address issues raised for the first time in a reply. Instead, such issues are deemed forfeited. (*Malmquist v. City of Folsom* (2024) 101 Cal.App.5th 1186, 1205, fn. 6.)

Even if we were inclined to address this argument, defendant would not be entitled to relief. Section 1172.6, subdivision (g) permits a defendant "whose conviction is *not final*" to challenge the validity of "*that conviction*." (§ 1172.6, subd. (g), italics added.) Our Supreme Court recently considered the applicability of this language to a similarly postured case in *Wilson*. As in the instant case, the defendant in *Wilson* was found guilty of murder and sentenced to death, and the guilt judgment was affirmed in his automatic appeal. (*Wilson*, *supra*, 14 Cal.5th at pp. 844–845, 870.) However, the sentence later was reversed and, following retrial, he again was sentenced to death. (*Id.* at p. 845.) On appeal from this second penalty phase verdict, the defendant argued he was entitled to seek relief from his murder conviction pursuant to section 1172.6, subdivision (g). (*Wilson*, at p. 870.)

The high court noted that the applicability of section 1172.6, subdivision (g) was "complicated . . . by the case's procedural posture." (*Wilson*, *supra*, 14 Cal.5th at p. 870.) "[W]hen a penalty phase judgment alone is reversed, 'the original judgment on the issue of guilt remains final during the retrial of the penalty issue and during all appellate proceedings reviewing the trial court's decision on that issue.' " (*Id.* at pp. 870–871.) Accordingly, the "defendant's murder conviction [in *Wilson*] would appear to have become final no later than 2009, when the time expired for seeking certiorari in the United States Supreme Court [following our Supreme Court's affirmance of the conviction]." (*Id.* at p. 870.) The high court intimated that its earlier "affirmance of the guilt judgment rendered [the] defendant's murder conviction final" for purposes of section 1172.6, subdivision (g). (*Wilson*, at p. 871.)

Ultimately, the high court did not resolve the applicability of section 1172.6, subdivision (g) to the appeal in *Wilson*. Instead, the Attorney General "assume[d] for purposes of [the] appeal that [the] defendant may challenge his conviction under section

18.

1172.6, subdivision (g) in [the] appeal from his sentence," and the high court therefore also assumed, without deciding, that the claim was properly presented. (*Wilson*, *supra*, 14 Cal.5th at p. 871.) The high court then concluded the defendant was not entitled to reversal because any retroactive error under section 1172.6 was harmless beyond a reasonable doubt. (*Wilson*, at p. 871.)

We acknowledge the high court's discussion of finality in *Wilson* is dicta. Nonetheless, it is persuasive on the issue of whether defendant's convictions may be challenged on direct appeal pursuant to section 1172.6, subdivision (g). Under the high court's reasoning in *Wilson*, defendant's convictions became final in 2006, after they were affirmed by the California Supreme Court and the United States Supreme Court denied defendant's petition for a writ of certiorari. (*Wilson*, *supra*, 14 Cal.5th at p. 870.) Because the convictions are final, defendant may not bring a challenge pursuant to section 1172.6, subdivision (g) in this appeal. (§ 1172.6, subd. (g) ["A person convicted of murder . . . whose *conviction is not final* may challenge on direct appeal the validity of *that conviction* . . . ." (italics added)].)

Neither party discusses the import of *Wilson* on this appeal or presents a compelling argument to controvert *Wilson*'s discussion of finality.[8] Instead, in his reply brief, defendant relies on the opinion in *People v. Padilla* (2020) 50 Cal.App.5th 244, affirmed, *People v. Padilla* (2022) 13 Cal.5th 152, for the proposition that a judgment becomes nonfinal when the sentence is vacated on habeas corpus. However, *People v. Padilla* considered whether *a judgment* became nonfinal for purposes of the retroactivity presumption set forth in *In re Estrada* (1965) 63 Cal.2d 740 (*People v. Padilla*, *supra*, 13 Cal.5th at p. 158; *People v. Padilla*, *supra*, 50 Cal.App.5th at p. 251), whereas the specific statutory language of section 1172.6, subdivision (g) specifies that relief is

_____

[8] Defendant cites *Wilson* once in his reply brief for the proposition that section 1172.6 permits challenges on appeal from nonfinal convictions but does not otherwise discuss the case.

19.

available where *the conviction* is not final (§ 1172.6, subd. (g); accord, *Wilson*, *supra*, 14 Cal.5th at p. 870).  Moreover, consistent with *Wilson*, both the Court of Appeal and Supreme Court in *People v. Padilla* recognized that the successful petition for writ of habeas corpus reopened the finality of the sentence for *Estrada* retroactivity purposes, but did not permit a defendant to relitigate claims relating to the conviction, which remained final.[9]  (*People v. Padilla*, 13 Cal.5th at pp. 169–170; *People v. Padilla*, 50 Cal.App.5th at pp. 252–253.)

In sum, defendant's murder convictions were undisturbed by the opinion and orders of the federal courts.  Defendant did not challenge his murder convictions through the section 1172.6 petition process, and his belated attempt to pursue relief on appeal pursuant to section 1172.6, subdivision (g) forfeited the issue.  Regardless, section 1172.6, subdivision (g) is inapplicable in this case because defendant's convictions are final.  (See *Wilson*, *supra*, 14 Cal.5th at p. 871.)  Accordingly, defendant remains convicted on two counts of murder and the trial court did not err in resentencing him on those counts.  Defendant retains any remedies that may be available to him through a new section 1172.6 petition brought in the trial court, and we do not opine on the merits of any such petition.

## III.    Sentencing Error

Defendant contends the court erred in imposing consecutive sentences on the murder counts.  In support of this argument, defendant presents an array of meandering and unrelated complaints regarding the sentence and sentencing proceedings.  We have addressed and rejected defendant's claim that the People and/or the trial court failed to

---

[9] We recognize that some courts, including this one, have declined to extend this aspect of the high court's decision in *People v. Padilla* to other contexts.  (See, e.g., *People v. Mitchell* (2023) 97 Cal.App.5th 1127, 1129–1140, rev. granted Feb. 21, 2024, S283474; *People v. Trent* (2023) 96 Cal.App.5th 33, 43, rev. granted Dec. 20, 2023, S282644.)  Regardless, it cannot be said that *People v. Padilla* supports a conclusion that defendant's *convictions* were rendered nonfinal by his successful habeas petition.

comply with the federal district court's orders, as well as his claim that he cannot be sentenced for murder because his convictions are invalid, and we therefore do not further address these claims of sentencing error. As for the rest of defendant's sentencing claims, he has once again failed to present these contentions under separate headings or subheadings, thus forfeiting the various issues. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Herrera v. Doctors Medical Center of Modesto, Inc.*, *supra*, 67 Cal.App.5th at p. 547.) We nonetheless explain these contentions below, none of which entitle defendant to reversal of the sentence.

### A. Vindictive Sentencing

Defendant contends the imposition of consecutive terms on the murder counts was vindictive. As stated, defendant forfeited this issue by failing to present it under a separate heading or subheading. Defendant also forfeited this issue by failing to object in the trial court. (*People v. Williams* (1998) 61 Cal.App.4th 649, 653–657.) Regardless, this argument is meritless.

"[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant." (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.) However, federal due process provisions protect a defendant from vindictiveness by the resentencing judge after having successfully attacked a conviction. (*North Carolina v. Pearce* (1969) 395 U.S. 711, 725–726.) To ensure this protection, federal case law requires a trial judge to state its reasons for imposing a more severe sentence upon a defendant after a new trial. (*Id.* at p. 726.) "Otherwise, a presumption arises that a greater sentence has been imposed for a vindictive purpose . . . ." (*Alabama v. Smith* (1989) 490 U.S. 794, 798–799.) Additionally, with limited exceptions not applicable here, California law categorically bars imposition of more severe punishment on resentencing based on double jeopardy and due process principles. (*People v. Hanson* (2000) 23 Cal.4th 355, 357, 365–367.)

21.

Here, defendant was not subject to a more severe sentence following resentencing. Defendant initially was sentenced to death, plus six-year concurrent sentences on the determinate counts, which were stayed pursuant to section 654. On resentencing, defendant was sentenced to two consecutive terms of 25 years to life, plus four-year concurrent sentences on the determinate counts, which were stayed pursuant to section 654. No individual component of the sentence was increased, nor was the aggregate sentence increased. No plausible argument can be made that defendant's sentence following resentencing was more severe than his original sentence.

Nonetheless, defendant contends the consecutive *indeterminate* sentences were vindictive because the original *determinate* terms were run concurrently. Defendant is incorrect that disparate treatment of indeterminate and determinate terms is indicative of a vindictive sentence. So long as the aggregate sentence imposed on resentencing was not greater than the sentence previously imposed, the court's prior determinations regarding concurrent or consecutive terms do not constrain the court's later choices at resentencing. (*People v. Trammel* (2023) 97 Cal.App.5th 415, 430–431 [for double jeopardy and due process purposes, the relevant question is whether the *aggregate* sentence is greater than that previously imposed]; *People v. Craig* (1998) 66 Cal.App.4th 1444, 1446–1448 [same].)

Accordingly, defendant's claim of a vindictive sentence is without merit.

## B. Right To Be Personally Present

In a footnote, defendant seemingly contends the imposition of consecutive sentences was erroneous because his right to personal presence was violated when he appeared remotely at the resentencing hearing. This argument is not presented under a separate heading or subheading and is not supported by argument or citation to the record. (Cal. Rules of Court, rule 8.204(a)(1)(B)–(C).) Regardless, any error in this regard was harmless beyond a reasonable doubt.

22.

### 1. Additional Background

On September 11, 2023, following the federal district court's issuance of the conditional writ of habeas corpus, the trial court issued an order for defendant to be made "available via [Z]oom for [the] next hearing . . . and all future court hearings before this Court."

Thereafter, defendant appeared by Zoom on December 8, 2023, at the hearing at which the parties stated their initial positions on resentencing and the court ordered further briefing. At the outset of the hearing, the court confirmed defendant was present and able to hear the proceedings.

At the next proceeding on February 16, 2024, defendant again appeared by Zoom. At one point early in the proceeding, the transcript notes "unclear audio" from defendant.

During the hearing, defense counsel repeatedly argued defendant could not be resentenced on his murder convictions. The court ultimately determined it would not address these contentions unless they were presented through the statutory procedure authorized by section 1172.6.

When defense counsel queried when resentencing would occur, the court offered to impose sentence immediately or at a later time, at defendant's choosing. The court indicated defendant would be facing an aggregate sentence of 50 years to life, with the determinate terms stayed pursuant to section 654. Defense counsel requested, and was granted, a brief recess, following which counsel chose to "[p]roceed to sentence" without preparation of a new report of the probation officer. Counsel waived arraignment and agreed there was no legal cause why sentence should not be pronounced. The court afforded counsel a final opportunity to make further arguments regarding sentencing and defense counsel argued the conviction and sentence were "unjust." The court then proceeded to sentence defendant as stated above.

At the conclusion of the proceeding, the court noted that defendant's microphone was off and asked defendant to confirm that he wished to waive a reading of his appellate

rights. The court noted that defendant gave a "thumbs up," and defendant then audibly confirmed that he understood his appellate rights. No other communications with defendant appear in the transcript.

### 2. Applicable Law

"A criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial. For purposes of the right to be present, a critical stage is 'one in which a defendant's " 'absence might frustrate the fairness of the proceedings' [citation], or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465.) The statutory right to be personally present is set forth in sections 977 and 1043, and "is coextensive with the state constitutional right but can only be waived in writing." (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 23.)

Sentencing is considered to be a critical stage where a defendant has a right to be present. (See *People v. Doolin* (2009) 45 Cal.4th 390, 453.) Likewise, resentencing, in which the court exercises its discretionary sentencing authority, is another critical stage. (*People v. Simms* (2018) 23 Cal.App.5th 987, 996; see *People v. Rouse* (2016) 245 Cal.App.4th 292, 300.)

The erroneous exclusion of a defendant from criminal proceedings is " 'trial error that is reversible only if the defendant proves prejudice.' " (*People v. Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 23.) We review errors pertaining to a defendant's federal constitutional right to be personally present at the proceedings under the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 23. (*People v. Nieves* (2021) 11 Cal.5th 404, 509.)

### 3. Analysis

As an initial matter, it does not appear that the court originally intended the February 16, 2024, hearing to include resentencing. At the prior hearing, the court

ordered the parties to submit briefing on the effect of the federal courts' opinions and orders, whether defendant "should be sentenced," and the appropriate sentence. The court's minute order for that hearing noted that the briefing also was to encompass arguments regarding section 1172.6. The February 16, 2024 hearing was calendared as a hearing on a petition to vacate the conviction and resentence pursuant to section 1172.6. The court did not order that a probation officer's report be prepared in anticipation of the hearing, further suggesting the court did not initially intend to resentence defendant on February 16, 2024. It was not until defense counsel requested to proceed with resentencing on February 16, 2024, that the court agreed to do so. Thus, defendant's remote appearance at the hearing is unsurprising. Nonetheless, once defense counsel chose to proceed with resentencing, defendant was not advised of his right to personally appear, nor was he or his counsel asked whether he wished to waive that right.

We thus consider whether the court's failure to secure defendant's physical presence or a valid waiver was harmless beyond a reasonable doubt. We conclude it was, inasmuch as defendant's appearance by Zoom did not contribute to the consecutive sentences imposed on the murder counts. Throughout the trial court proceedings, the People asked the court to impose consecutive terms of 25 years to life on these counts. Before defense counsel requested to proceed with immediate resentencing, the court indicated it would impose consecutive terms of 25 years to life on these counts. When defense counsel argued it was inconsistent to impose consecutive sentences for the murders in light of the former concurrent sentences on the determinate counts and that all the offenses arising out of the "[s]ame transaction, same occurrence, . . . same event," the court disagreed. The court explained to defense counsel, "No. That's totally incorrect. So you have a death and another death, those can certainly run consecutive. . . . Each murder, even concurrently committed, can be a consecutive sentence." Counsel presented no further argument in support of concurrent sentencing, other than to argue that defendant's entire sentence was unjust. The court proceeded to sentence defendant

25.

as indicated to consecutive terms of 25 years to life. Defendant's physical absence from the courtroom did not affect this result.

The bare allegations contained in defendant's opening brief do not suggest he was prejudiced by the failure to procure his physical presence or an express waiver of said presence. First, defendant contends he was prejudiced because he "was unable to adequately hear the proceedings." The record is devoid of any indication that defendant could not see or hear the proceeding, or that he desired to communicate with the court and was not permitted to do so. To the contrary, when asked at the end of the hearing if he understood his appellate rights, he responded affirmatively.

Defendant also contends he "had no ability to consult with counsel, had no ability to review or consult with counsel on numerous waivers requested by the court, and had no ability to have confidential communication with his counsel regarding the proceedings." However, neither the record nor defendant's bare arguments indicate that defendant would have added any significant information in support of concurrent sentencing, beyond that presented by defense counsel. (*People v. Nieves*, *supra*, 11 Cal.5th at p. 509 [the defendant's absence from restitution hearing not prejudicial where she was represented by counsel and nothing in record indicated she would have added any significant information to the issues or to counsel's argument].) Resentencing proceedings were pending for five months following the federal district court's order, and the People's position on consecutive sentencing was known to the defense at least two months prior to resentencing. Counsel had ample opportunity to discuss resentencing with defendant and, " '[a]ssuming [counsel] did so, defendant's presence at the hearing would have added little to [his] attorney['s] ability to argue' " in favor of concurrent sentences. (*Ibid*.)

Accordingly, any violation of defendant's right to physical presence was harmless beyond a reasonable doubt.

### C. Conduct by the People

Defendant contends the court erred in imposing consecutive sentences because the People failed to submit a timely sentencing brief and engaged in unspecified "unconstitutional behavior and deceptive practices."

At the conclusion of the December 8, 2023 hearing, the court ordered counsel for both parties to submit briefing by January 19, 2024. Defendant timely filed a resentencing brief and motion for release from custody on January 19, 2024. The People filed an opposition to the motion for release on February 13, 2024, but did not otherwise file a resentencing brief.

Defendant does not explain how he was prejudiced by the People's failure to file a resentencing brief. Again, the People's position on consecutive sentencing was known to defendant at least as early as the December 8, 2023 hearing. Accordingly, this claim does not entitle defendant to reversal of the sentence.

We are unable to address defendant's claim that the People engaged in "unconstitutional behavior and deceptive practices" because defendant does not elaborate further on this conduct. To the extent defendant refers to the *Napue* and *Brady* violations arising from Richard B.'s testimony, he has been granted relief on those claims by the federal district court.

### D. Lack of Tentative Ruling

Finally, defendant contends the trial court erred in imposing consecutive terms on the murder counts because it did not provide defendant or his counsel with a tentative ruling prior to sentencing.

Defendant cites no authority for the proposition that a tentative ruling was required, nor does he explain how he was prejudiced by the lack of a tentative ruling. Regardless, his assertion is factually incorrect. When the court offered to impose sentence immediately or at a later date, it indicated it would impose consecutive terms of 25 years to life on the murder counts, with determinate terms on the remaining counts

imposed and stayed pursuant to section 654. After a brief recess, defense counsel chose to proceed with resentencing. Accordingly, counsel was aware of the proposed sentence prior to agreeing to proceed with resentencing.

Defendant is not entitled to reversal on this basis.

## DISPOSITION

The judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.

28.